IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN CHARLES EICHINGER,                    :
                                           :
            Petitioner,                    :
                                           :
      v.                                   :      CIVIL ACTION NO. 07-4434
                                           :      CAPITAL HABEAS CASE
JOHN WETZEL, Commissioner,                 :
Pennsylvania Department of Corrections;    :
ROBERT GILMORE, Superintendent of          :
the State Correctional Institution at Greene; :
and MARK GARMAN, Superintendent of         :
State Correctional Institution at Rockview, :
                                           :
            Respondents.                   :

## MEMORANDUM

**Padova, J.**                                         **January 16, 2019**

John Charles Eichinger, a prisoner under sentence of death in the Commonwealth of
Pennsylvania, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition,
Eichinger attacks both his conviction and sentence asserting numerous claims of ineffective
assistance of counsel, trial court error, and prosecutorial misconduct. Having reviewed the
extensive pleadings and the voluminous state court record that includes twenty-two days of post-
conviction evidentiary hearings, and having conducted oral argument, we deny the petition.


## I.      FACTS — TRIAL EVIDENCE OF THE CRIMES OF CONVICTION

Eichinger waived his right to a jury for the guilty phase of all counts, which were tried in
a stipulated bench trial. (A37 at n.3; A3303.[1]) The decision of the Pennsylvania Supreme Court

---

[1] All "A" citations refer to the multi-volume, sequentially paginated Appendix filed by
Eichinger with his Amended Petition for Writ of Habeas Corpus. (See Docket Entry 55.)

("PSC") affirming Eichinger's convictions on direct appeal recited the factual basis of his

convictions as follows:

> On the morning of March 25, 2005 Eichinger drove to the Greaves'
> residence. Eichinger told police that he intended to kill Heather Greaves unless she
> ended her relationship with her most recent boyfriend. To this end, Eichinger
> arranged to meet with Heather so that she would be expecting him at her house that
> day. Eichinger carried a large knife and a pair of rubber gloves in his waistband and
> concealed them under his sweat jacket.

> Eichinger went into the house to speak with Heather. An argument ensued
> and Eichinger pulled out the knife and stabbed her repeatedly in the stomach.
> Eichinger admitted that he purposefully stabbed Heather in the stomach, because
> "[he] had heard in movies and books that it was easier to puncture organs there than
> through the chest, where it is more difficult because of hitting bone." []

> Avery, Heather's three-year-old daughter, was in the room and witnessed
> the stabbing. When Heather cried to Avery to call 911, Eichinger turned away from
> Heather and slashed Avery in the neck. Avery ran down the hallway before she
> fell. Eichinger followed her and came upon Lisa, Heather's sister coming out of
> the bathroom. Eichinger confessed to police, "I had to stab Lisa, too. I couldn't go
> to jail." [] Lisa tried to run back into the bathroom and shut the door, but Eichinger
> was able to overpower her. He stabbed Lisa repeatedly in the stomach.

> Eichinger moved back towards the kitchen where Heather was dying, but
> not before he stabbed Avery once more, in the back. He stabbed her with such
> force that the blade came out her chest, and pinned her to the floor. Eichinger
> admitted to police that, "I couldn't even let the three-year old identify me. I had
> known her since she was born and she knew my name. She could speak my name."
> Back in the kitchen, Eichinger stabbed Heather in the diaphragm and slit her throat.

> Eichinger went to the sink to wash his hands and noticed he was cut. He
> used one of the rubber gloves to prevent his blood from being left at the crime
> scene. Before leaving, Eichinger cut open Lisa's shirt to make it appear that she
> had been the target of the rampage in order to confuse the police. Heather and
> Lisa's father discovered the murders later that day. The police spoke to a neighbor
> who had witnessed Eichinger leaving the Greaves' home that morning.

> Upon receiving this information, Detective Richard Nilsen, a Montgomery
> County Detective, along with Detective James Godby of the Upper Merion Police
> Department, went to the Somers Point, New Jersey Acme Food Market where
> Eichinger was employed. Eichinger agreed to be interviewed. After some
> discussion, and a false statement to the police, Eichinger confessed to the Greaves
> murders.

During the same conversation, Eichinger also confessed that he used the knife from the Greaves' murders to kill another woman, Jennifer Still, on July 6, 1999. Eichinger admitted to police that he killed Jennifer because she rejected him in order to stay with her fiancé. Eichinger described this murder:

> I had the knife in my hand. I turned away from her for a second and couldn't believe she was doing that to me. She got real close to me. I thought, 'You're ripping my heart out and now you're getting close to me.' She put her hand on my shoulder. I turned around and stabbed her in the stomach.

> \*\*\*

> After I stabbed her the first time, she stepped back, but didn't fall. Her blood splattered out at me. I lunged at her. I just kept stabbing her.

> \*\*\*

> I slit her throat as she slid down the wall. I let her body weight cut her throat against the knife.

Eichinger saved his clothes from that day, and collected articles about the murder to serve as reminders. After using the knife to kill Jennifer in 1999, he stored it in a sheath in a cooler. Eichinger told police, "I had it in the cooler with the rubber gloves and the Scream mask. Every Halloween I put the mask, gloves, and knife on and handed out candy at the door."

As a result of his confessions, Eichinger was arrested and later transported back to Montgomery County. In transit, Eichinger made another incriminating statement describing the triple-homicide as well as the earlier murder of Jennifer Still to the police. This statement was later memorialized in writing.

Eichinger filed an omnibus pre-trial motion seeking to suppress his statements to the police. This motion was denied. Eichinger and Detective Nilsen then testified at a pre-trial hearing on September 15, 2005. The trial judge found Detective Nilsen's testimony to be credible and found that all of the statements made by Eichinger to the police were admissible at trial. []

Eichinger waived his right to a jury in favor of a guilt phase bench trial which was held on October 18, 2005. Eichinger did not contest the charges against him and offered no defense, rather he stipulated to the evidence offered by the Commonwealth at the September 15th Pre-Trial Hearing. Eichinger was adjudicated guilty of all charges, and the Commonwealth sought the penalty of

death for the murders of Heather Greaves, Lisa Greaves and Avery Johnson. The sentencing phase was tried before a jury beginning on November 1, 2005. Although he did not contest his guilt, Eichinger did contest the imposition of the death penalty. The jury found two aggravating factors in the death of Heather Greaves: that Eichinger had been convicted of another state offense for which a sentence of life imprisonment is imposable and that Eichinger had been convicted of another murder which was committed before or at the time of the offense at issue. The first aggravating factor related to the murder of Jennifer Still six years earlier. The second related to the murder of Lisa Greaves and Avery Johnson which was contemporaneous with the murder of Heather Greaves. The jury then found the same two aggravators for the murder of Lisa Greaves plus a third aggravating factor, that the victim was a witness to a murder and was killed to prevent her testimony in any criminal proceeding concerning the offense. The jury also found the same three aggravating factors they found for Lisa Greaves for the murder of Avery Johnson, plus a fourth aggravating factor, that Avery Johnson was a child less than twelve years of age. The jury determined that there was one mitigating factor for each of these three murders, namely that Eichinger was under the influence of extreme mental or emotional disturbance. Finding that the weight of the aggravating factors was greater than the weight of the mitigating factor in each case, the jury returned a verdict of death for the murders of Heather, Lisa and Avery.

      On December 12, 2005 the trial court imposed three consecutive death sentences for the murders of Heather and Lisa Greaves and Avery Johnson and one sentence of life imprisonment for the murder of Jennifer Still. The court additionally imposed two consecutive sentences of 2.5 to 5 years for possessing an instrument of crime and three consecutive sentences of 1 to 2 years for unsworn falsification.

Commonwealth v. Eichinger, 915 A.2d 1122, 1128-30 (Pa. 2007) (footnotes and citations to the state court record omitted).

      In adjudicating Eichinger's petition filed pursuant to the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541, the PCRA Court also made factual findings about the defense evidence presented at the penalty phase proceedings:

      At the penalty phase of the trial, [Lead Trial Counsel William] McElroy presented the testimony of two mental health experts, Dr. Gillian Blair, a clinical psychologist, and Dr. Kenneth Weiss, a psychiatrist. []

      Dr. Blair testified that in relevant part that she diagnosed Appellant with a personality disorder, schizoid with prominent dependent traits. [] In her report she explained that Appellant has poor coping skills and is susceptible to decompensation at times of heighteneded [sic] stress." [sic] [] Dr. Blair explained

that decompensation means that someone loses control and behaves in ways in which they normally would not behave, without considering the consequences of their behavior. [] Dr. Blair's testimony went towards the defense argument that at the times of the 1999 Still murder and the 2005 Greaves-Johnson murders, Appellant decompensated as those were times of acute stress in Appellant's life because of his father's diagnosis of and deterioration based upon his Alzheimer's illness. In her testimony, Dr. Blair emphasized that Appellant has had very few people in his life who were really close to him and when his father, with whom he was the closest, was diagnosed with Alzheimer's, it was very devastating to him. []

Next, Dr. Weiss' assessment of Appellant included the diagnosis of adjustment disorder with a disturbance in mood and conduct. [] Dr. Weiss explained that Appellant became very disturbed after this [sic] father's diagnosis of Alzheimer's disease [] Specifically, Dr. Weiss testified that in 1999, when Appellant's father was hospitalized, Appellant exhibited an adjustment disorder, which persisted though [sic] the approximately five weeks between the time of the hospitalization and the Still murder. [] Dr. Weiss also diagnosed Appellant with a personality disorder, schizoid, schizotypal and dependent. [] Dr. Weiss testified that the same two diagnoses of adjustment disorder and personality disorder recurred at the time of the Greaves-Johnson murders. [] Dr. Weiss correlated these murders with Appellant's father being moved to hospice care. []

Also in support of his defense theory, Mr. McElroy called Appellant's mother, Chris Eichinger and Appellant's brother Steven Eichinger, to the stand. Mrs. Eichinger testified about Appellant's father's diagnosis with Alzheimer's disease and the significant effect that it had on Appellant. [] Steven Eichinger testified primarily about Appellant's relationship with their mother and his role in the family. []

Finally, Mr. McElroy presented the testimony of Appellant's co-worker, Susan Broomall and his corrections counselor, Steven Allenson.

(A41-43 (internal citations to the record omitted).)


III.    DIRECT APPEAL PROCEEDINGS

Following his conviction, trial counsel McElroy filed a direct appeal to the PSC in which

he raised the following issues of trial court error:

1.    The trial court erred by denying the defendants [sic] motion to suppress a statement he made to Montgomery County detectives at an Acme Market in New Jersey.

2.	The trial court erred by denying the defendants [sic] motion to suppress a statement he gave to Montgomery County detectives while being transported in New Jersey to Pennsylvania.

3.	The trial court erred by denying the defendants [sic] motion to suppress a statement he gave to Montgomery County detectives at Upper Merion police station.

4.	The trial court erred by refusing to give a presumption of life instruction to the jury.

5.	The trial court erred by permitting admission of a victim impact statement which resulted in a sentence of death because of the passion and prejudice inherent in the statement.

6.	The trial court erred by permitting the use of multiple confessions during the penalty phase, where the probative value of multiple confessions was outweighed by the unfair prejudice of repeated reading of the defendants [sic] admissions, after he had already been found guilty in the guilt phase.

7.	The trial court erred by permitted autopsy testimony during the penalty phase because the prejudicial impact outweighed the probative value of the evidence when the defendant had already been found guilty of the specific intent to kill in the guilty phase.

8.	The trial court erred by denying the defendant his right to allocution during the penalty phase and permitting the Commonwealth to cross examine the defendant if he had taken the stand to express his remorse, said denial having a chilling effect on the defendant testifying and apologizing for what he did.

9.	The trial court erred by permitting the jury to consider 42 Pa.C.S.A. section 9711(d)(5) as an aggravating circumstance for the homicide of Avery Johnson, when there was no proof that Avery Johnson would have been legally competent to testify as a witness in court given her age of three years old.[2]

10.	The trial court erred by not allowing all of the defendants [sic] mitigating circumstances pursuant to 42 Pa.C.S.A. section 9711(e)(8), to be listed

---

[2] 42 Pa. Cons. Stat. § 9711(d)(5) provides that an aggravating circumstance supporting the imposition of the death penalty includes the fact that the "victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses."

individually on the verdict sheet for the jury's consideration.[3]

(A310-11.) The PSC, after first undertaking an independent review of the sufficiency of the evidence, Eichinger, 915 A.2d at 1130 (citing Commonwealth v. Zettlemoyer, 454 A.2d 937, 942 n.3 (Pa. 1982)), and concluding that the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, was "sufficient beyond a reasonable doubt to establish murder of the first degree in each death," id. at 1131, rejected Eichinger's direct appeal issues and affirmed the judgment of sentence.

## III.    POST-CONVICTION PROCEEDINGS

Eichinger filed a *pro se* PCRA petition on November 19, 2007. After current counsel entered an appearance, they filed an Amended Petition for Writ of Habeas Corpus and for Collateral Relief from Criminal Conviction pursuant to the Post Conviction Relief Act raising the following issues regarding the guilt phase of Eichinger's conviction:

I.    Counsel ineffectively failed to investigate and present Petitioner's mental impairments and their impact on possible defenses and his waiver of a variety of rights, in violation of Petitioner's rights under the Sixth and Fourteenth Amendments.

II.    Petitioner was denied his Sixth Amendment Right to counsel and Fourteenth Amendment right to due process of law during pretrial proceedings (a) during his extradition colloquy and hearing, (b) by the Commonwealth questioning him outside the presence of a lawyer after the prosecution had commenced; ineffective assistance of prior counsel for failing to litigate this issue.

III.    Petitioner's waiving his constitutional right to a jury trial was not knowing, intelligent and voluntary, and violated his right to effective counsel when counsel failed to investigate, prepare and develop the defense case, thus failing to provide Petitioner was counsels' advice regarding the waiver.

IV.    The trial court's colloquy securing Petitioner's waiver of his right to a jury

---

[3] 42 Pa. Cons. Stat. § 9711(e)(8) provides that mitigating circumstances include "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."

trial and his right to contest the evidence was constitutionally insufficient; all prior counsel were ineffective for failing to object to the colloquy.

V.      Counsels' ineffective failure to adequately investigate, prepare and develop the defense case in order to give Petitioner the benefit of Counsels' full and careful advice resulted in Petitioner's uninformed agreement to a stipulated "trial" where he did not contest the charges and failed to present a defense.

VI.     The appointment of trial counsel less than three weeks before the trial began was a constructive denial of the Sixth Amendment right to counsel; all prior counsel were ineffective for failing to litigate this claim.

VII.    The statements introduced against Petitioner at trial were unconstitutionally obtained in violation of the Fifth, Sixth and Fourteenth Amendments.  Evidence seized based on these statements should have been suppressed.  All prior counsel were ineffective for failing to investigate and litigate these claims and the suppression hearing regarding these issues was neither full nor fair.

VIII.   Petitioner was denied his right to testify at the guilt phase when counsel failed to properly and adequately investigate, prepare and develop Petitioner's case before advising him to waive any of his constitutional rights.

IX.     Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated by trial counsel's failure to investigate the Commonwealth's DNA evidence and trial counsel's consequent stipulation to this evidence.

X.      Petitioner is actually innocent of the murder of Jennifer Still, and is actually innocent of first degree murder regarding the other victims; he was convicted due to ineffective assistance of counsel and the suppression of exculpatory evidence in violation of Brady v. Maryland.

XI.     Petitioner was incompetent to stand trial; trial counsel was ineffective for failing to investigate and request a competency hearing and the trial court erred in failing to hold a competency hearing despite indicia Petitioner was incompetent, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

(A2809-2867.)   The Amended PCRA Petition also raised the following issues regarding the penalty phase of Eichinger's trial:

XII.    Counsel were ineffective at the penalty phase for failing to investigate, develop and adequately present substantial mitigating evidence in violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

XIII.   Trial counsel rendered ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments by failing to effectively cross examine the

8

Commonwealth's forensic psychiatric expert witness Timothy Michals.

XIV.   The death sentence resulted from false and unreliable testimony in violation of Petitioner's due process rights and the Eighth and Fourteenth Amendments.

XV.   Petitioner is entitled to a new sentencing hearing because the Commonwealth was permitted to introduce irrelevant and inflammatory evidence of nonstatutory aggravating circumstances.

XVI.   The penalty phase jury instructions deprived petitioner of a constitutionally reliable sentence.

XVII. The prosecutor's closing argument in the penalty phase was grossly improper and violated the Eighth Amendment.

XVIII. The prosecutor improperly injected future dangerousness into the case in his cross-examination of petitioner's mental health expert.

XIX.   The sentencing phase jury was falsely instructed that persons sentenced to life for first-degree murder had in fact received commutations in violation of the Eighth and Fourteenth Amendments.

XX.   Trial counsel ineffectively failed to investigate and present available evidence that petitioner was not a future danger.

XXI.   Trial counsel's failure to investigate resulted in the use of an aggravating circumstance that otherwise could have been excluded. Petitioner's death sentence for the murder of Avery Johnson must be vacated.

XXII.  All prior counsel were ineffective for failing to raise and properly litigate the issues presented in the collateral proceedings.

XXIII. Petitioner is entitled to relief from his conviction and sentence because of the cumulative effect of errors raised in this Petition.

XXIV. The jury's ability to consider and give effect to the relevant mitigating evidence was impaired.

XXV.  The PCRA Court erred in denying Petitioner's motion to present a witness in rebuttal of Commonwealth witness Dr. John O'Brien.

XXVI. Petitioner was denied a full and fair post-conviction proceeding.

XXVII.  Petitioner was denied his right to a full and fair post-conviction proceeding because he was prohibited from fully developing the evidence in support of his claims as a result of the PCRA Court's adverse rulings on his proposed witness

questions and documentary evidence offered for admission.

(A2868-2926.) The PCRA Court rejected each of these issues after conducting twenty-two days of evidentiary hearings. Following the PCRA Court's denial of his petition, Eichinger appealed to the PSC presenting 12 issues for review:

I.      Was [a]ppellant denied a full and fair PCRA proceeding?

II.      Was [a]ppellant denied effective assistance of counsel because trial counsel failed to investigate factual defenses, legal defenses, or whether [a]ppellant was able to make a knowing, intelligent and voluntary waiver prior to [a]ppellant's jury waiver and stipulated bench trial?

III.      Did trial counsels' ineffective failure to investigate, prepare and develop the defense case in order to give appellant the benefit of counsels' full and careful advice result in [a]ppellant's uninformed agreement to a stipulated "trial" where he did not contest the charges and failed to present a defense?

IV.      Was the trial court's colloquy securing [a]ppellants' [sic] waiver of his right to a jury trial and his right to contest the evidence against him constitutionally insufficient and were all prior counsel ineffective for failing to object to this colloquy?

V.      Were the statements introduced against [a]ppellant at trial unconstitutionally obtained, should the evidence seized based on these statements have been suppressed, and were prior counsel ineffective for failing to investigate and litigate these claims?

VI.      Was [a]ppellant denied effective assistance of counsel because trial counsel failed to investigate, develop and present substantial mitigating evidence?

VII.      Did the prosecutor improperly inject future dangerousness into [a]ppellant's trial during cross-examination of Appellant's mental health expert; and was [a]ppellant denied effective assistance of counsel because trial counsel failed to prevent this?

VIII.      Was [a]ppellant denied effective assistance of counsel because trial counsel failed to effectively cross examine Commonwealth witness Timothy Michals?

IX.      Was the prosecutor's closing argument in the penalty phase grossly improper and was [a]ppellant denied effective assistance of counsel because trial counsel failed to object and raise these instances of improper argument, in violation of [a]ppellant's constitutional rights?

X.     Did the penalty phase jury instructions deprive [a]ppellant of a constitutionally reliable sentence in multiple respects and did prior counsel ineffectively litigate these errors, in violation of [a]ppellant's constitutional rights?

XI.     Are [a]ppellant's death sentences unconstitutional because the sentencing jury's ability to consider and give effect to the relevant mitigating evidence was impaired, violating his constitutional rights, and was [a]ppellant denied effective assistance of counsel because all prior counsel failed to raise this claim?

XII.     Was [a]ppellant denied due process, reliable sentencing and effective assistance of counsel because of the cumulative prejudicial effect of all errors described in [appellant's b]rief?

(A168-69.)  The PSC rejected each of these claims, grouping them first into claims involving (1) ineffective assistance of counsel based upon failures to contest trial errors, (2) ineffective assistance of counsel based on substandard performance, (3) the cumulative effect of ineffective assistance, and (4) due process errors by the PCRA Court.[4]  With one exception, Eichinger's amended federal habeas petition repeats the issues he raised and exhausted before PSC.[5]

## IV.     STANDARDS OF REVIEW

### A.     Habeas Standards

"AEDPA 'limits the power of a federal court to grant habeas relief to a person in custody pursuant to a state court judgment' to when the person's custody is 'in violation of the Constitution or laws or treaties of the United States.'"  Abdul-Salaam v. Sec'y of Pa. Dep't of Corr., 895 F.3d 254, 265 (3d Cir. 2018) (quoting Han Tak Lee v. Glunt, 667 F.3d 397, 402 (3d Cir. 2012) quoting

---

[4] Eichinger's federal habeas memorandum uses the same grouping of claims.  We will also analyze the claims as they were grouped by the PSC.

[5] The only claim Eichinger has omitted from his federal petition is the claim that he was denied a full and fair PCRA hearing because the PCRA Court interfered with his right to present relevant testimony during the evidentiary hearing, including presenting testimony to rebut Commonwealth expert opinion that he would be a risk in prison.  The claim was deemed waived by the PSC because, although it was included in his PSC Brief, he failed to state the issue with sufficient specificity in his Rule 1925(b) Statement.  (See A203-04 (PSC Opinion) (citing (Rule 1925(b) Statement (A3157-63)); see also A2477 n.3 (Pet. PSC Brief).)

28 U.S.C. § 2254(a)). Where a state court adjudicates the merits of a federal claim, a district court may grant habeas relief on that claim only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained the two components of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13. To determine whether a state court's application of federal law is "unreasonable," we must apply an objective standard, such that the relevant application "may be incorrect but still not unreasonable." Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (citing Williams, 529 U.S. at 409-10). The test is whether the state court decision "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) (en banc).

With respect to § 2254(d)(2), "'[f]actual issues determined by a state court are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.'" Dellavecchia v. Sec'y Pa. Dep't of Corr., 819 F.3d 682, 692 (3d Cir. 2016) (alteration in original) (quoting Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000)). State court factual determinations are not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010)

(citing <u>Williams</u>, 529 U.S. at 411). Rather, "§ 2254(d)(2) requires that we accord the state trial court substantial deference." <u>Brumfield v. Cain</u>, 135 S.Ct. 2269, 2277 (2015). If "'[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" <u>Wood</u>, 558 U.S. at 301 (quoting <u>Rice v. Collins</u>, 546 U.S. 333, 341-342 (2006) (alteration in original)). However, "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,'" and "'does not by definition preclude relief.'" <u>Brumfield</u>, 135 S.Ct. at 2277 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003)).

If the state court did not address the merits of a federal claim, "'the deferential standards provided by AEDPA . . . do not apply,' and we 'must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA.'" <u>Johnson v. Folino</u>, 705 F.3d 117, 127 (3d Cir. 2013) (quoting <u>Taylor v. Horn</u>, 504 F.3d 416, 429 (3d Cir. 2007); and <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001)). A state court decision is "an unreasonable application" of Supreme Court case law only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Abdul-Salaam</u>, 895 F.3d at 265-66 (quoting <u>Williams</u>, 529 U.S. at 413). "'A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.'" <u>Id.</u> (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004))).

### B. Exhaustion of Remedies and Procedural Default

A habeas petitioner must "exhaust [] the remedies available in the courts of the State" before obtaining habeas relief. 28 U.S.C. § 2254(b)(1)(A). If the state courts have declined to

review the merits of a petitioner's claim based on his failure to comply with an independent and adequate state rule of procedure, the claim is procedurally defaulted. See Harris v. Reed, 489 U.S. 255, 262-63 (1989). Although "[a] habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion[, as] there are no state remedies any longer 'available' to him," Coleman v. Thompson, 501 U.S. 722, 732 (1991), procedurally defaulted claims cannot be reviewed unless "the [petitioner] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Id. at 750.

For a claim to be exhausted, "'[b]oth the legal theory and the facts underpinning the federal claim must have been presented to the state courts, and the same method of legal analysis must be available to the state court as will be employed in the federal court.'" Tome v. Stickman, 167 F. App'x 320, 322-23 (3d Cir. 2006) (quoting Evans v. Court of Common Pleas, De. Cty., Pa., 959 F.2d 1227, 1231 (3d Cir. 1992)). A state prisoner must "fairly present" his federal claims to the state courts before seeking federal habeas relief by invoking "one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see Holloway v. Horn, 355 F.3d 707, 714 (3d Cir. 2004) (quoting McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999) ("'Fair presentation' of a claim means that the petitioner 'must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.'")). The habeas petitioner bears the burden of proving exhaustion of all state remedies. Boyd v. Waymart, 579 F.3d 330, 367 (3d Cir. 2009) (quoting Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997)).

"Exhaustion is not a jurisdictional requirement, but rather a rule of comity, and a federal court may in certain circumstances decide the merits of a claim despite non-exhaustion." Evans,

959 F.2d at 1231.  A district court may deny a claim on its merits despite non-exhaustion "if it is perfectly clear that the applicant does not raise even a colorable federal claim."  Id. (quoting Granberry v. Greer, 481 U.S. 129, 135 (1987)).  Like the exhaustion requirement, the doctrine of procedural default is grounded in principles of comity and federalism.  As the Supreme Court has explained:

> In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000) (quoting Coleman, 501 U.S. at 732).  To demonstrate cause and prejudice, the petitioner must show some objective factor external to the defense that impeded counsel's efforts to comply with some state procedural rule.  Slutzker v. Johnson, 393 F.3d 373, 381 (3d Cir. 2004) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  To demonstrate a fundamental miscarriage of justice, a habeas petitioner must typically demonstrate actual innocence.  Schlup v. Delo, 513 U.S. 298, 324-26 (1995).

### C.    Ineffective Assistance of Counsel Standards

A claim for ineffective assistance of counsel is grounded in the Sixth Amendment right to counsel, which exists "'in order to protect the fundamental right to a fair trial.'"  Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  To prevail on a claim for ineffective assistance of counsel, a habeas petitioner must demonstrate both that (1) his attorney's performance was deficient, i.e., that the performance was unreasonable under prevailing professional standards, and (2) that he was prejudiced by his attorney's performance.  Strickland, 466 U.S. 668, 687-88, 690-92. Counsel's deficiencies must be "so serious" that he "was not functioning as the 'counsel' guaranteed" to Petitioner by the Sixth

Amendment. Id. at 687. This standard is "highly deferential" to defense counsel, as "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 689-90. It is presumed that "counsel's conduct might have been part of a sound strategy," and "if the Commonwealth can show that counsel actually pursued an informed strategy (one decided upon after a thorough investigation of the relevant law and facts), the 'weak' presumption becomes a 'strong' presumption, which is 'virtually unchallengeable.'" Thomas v. Varner, 428 F.3d 491, 499-500 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 690).

"We may address the prejudice prong first '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice.'" United States v. Travillion, 759 F.3d 281, 289 (3d Cir. 2014) (alteration in original) (quoting Strickland, 466 U.S. at 697). Prejudice is proven if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Consequently, counsel cannot be found to be ineffective for failing to pursue a meritless claim. See United States v. Bui, 795 F.3d 363, 366-67 (3d Cir. 2015) ("'[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.'" (quoting United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999))).

In reviewing Eichinger's ineffective assistance of counsel claims for post-conviction relief, the PSC and the PCRA Court applied Pennsylvania's ineffectiveness standard, see Commonwealth v. Pierce, 527 A.2d 973, 974-75 (Pa. 1987), which requires a defendant to establish that: (1) his underlying claim has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) resulting prejudice. (See A75 (citing Pierce and Strickland); A170 (citing Pierce).) The United States Court of Appeals for the Third Circuit has held that the Pierce standard comports

with the clearly established federal <u>Strickland</u> standard. <u>Werts</u>, 228 F.3d at 203-04. As a result, Eichinger must establish that the Pennsylvania courts' application of <u>Pierce</u> was "not only erroneous, but objectively unreasonable." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (citations omitted). However, the Supreme Court has instructed that "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Nguyen v. Attorney Gen. of N.J.</u>, 832 F.3d 455, 465 (3d Cir. 2016) (alteration in original) (quoting <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010)). Thus, the <u>Strickland</u> standard must be applied "'with scrupulous care,'" which makes it "all the more difficult" to "[e]stablish[ ] that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d)." <u>Id.</u> (quoting <u>Premo v. Moore</u>, 562 U.S. 115, 122 (2011)).

## VI.    CLAIMS RELATED TO THE PRE-TRIAL AND GUILT PHASES

**A.    Deficient performance in proving legal advice during the pre-trial plea negotiation process — failure to investigate factual defenses, legal defenses, and whether Petitioner was able to make a knowing, intelligent and voluntary jury waiver and consent to a stipulated bench trial.**

Eichinger argues that the following four aspects of trial counsels' pre-trial plea process representation fell below the <u>Strickland</u> objective standard of reasonableness:  (a) trial counsel failed to understand and account for fundamental legal principles, which resulted in trial counsel affirmatively misadvising him regarding critical constitutional rights; (b) based on their factual misunderstanding of the Commonwealth's plea offer, trial counsel actively misrepresented the terms of the offer; (c) trial counsel failed to account for and explain alternatives to, and consequences of, agreeing to a stipulated, non-adversarial guilt phase for both cases; and (d) trial counsel failed to investigate any plausible guilt phase defenses before giving their advice.

The Sixth Amendment right to the effective assistance of counsel "extends to the plea-bargaining process." Lafler v. Cooper, 566 U.S. 156, 162 (2012). Therefore, before deciding whether to plead or go to trial, a criminal defendant is entitled to "the effective assistance of competent counsel." McMann v. Richardson, 397 U.S. 759, 771 (1970); see also Lafler, 566 U.S. at 165 (the "Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding," including "pretrial critical stages" where the defendant must make "critical decisions" such as whether to accept a plea or go to trial); id. at 169 ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."); Missouri v. Frye, 566 U.S. 134, 140 (2012) ("It is well settled that the right to the effective assistance of counsel applies to certain steps before trial.") (citing Argersinger v. Hamlin, 407 U.S. 25 (1972) (entry of guilty plea)); id. at 143 ("[D]efense counsel have responsibilities in the plea bargain process . . . that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages."); Padilla v. Kentucky, 559 U.S. 356, 370 (2010) (noting the "critical obligation of counsel to advise the client of 'the advantages and disadvantages of a plea agreement'") (quoting Libretti v. United States, 516 U.S. 29, 50-51 (1995)); Von Moltke v. Gillies, 332 U.S. 708, 721 (1948) (plurality opinion) ("[A]ccused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered.").

The two-part Strickland test governs "ineffective-assistance claims arising out of the plea process." Hill v. Lockhart, 474 U.S. 52, 57 (1985). Thus, a petitioner must first show that counsel's advice "fell below an objective standard of reasonableness." Id. (quoting Strickland, 466 U.S. at 687-88). The prejudice inquiry "focuses on whether counsel's constitutionally

ineffective performance affected the outcome of the plea process." Id. at 59; Lafler, 566 U.S. at 163 (prejudice is shown where "the outcome of the plea process would have been different with competent advice"); Frye, 566 U.S. at 148 (the prejudice inquiry for constitutionally deficient advice in the plea bargain context turns on "whether 'the result of the proceeding would have been different'") (quoting Strickland, 466 U.S. at 694). A petitioner demonstrates prejudice by showing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

In the context of challenging the advice trial counsel gave a defendant during the plea-bargaining stage, "the question is not the fairness or reliability of the trial but the fairness and regularity of the processes that preceded it, which caused the defendant to lose benefits he would have received in the ordinary course but for counsel's ineffective assistance." Lafler, 566 U.S. at 169 ("The fact that respondent is guilty does not mean he was not entitled by the Sixth Amendment to effective assistance or that he suffered no prejudice from his attorney's deficient performance during plea bargaining."). Thus, any issue regarding the voluntariness of Eichinger's waiver of rights is independent of this claim regarding trial counsels' ineffectiveness. See Frye, 566 U.S. at 141 (noting that Supreme Court has "rejected the argument . . . that a knowing and voluntary plea supersedes errors by defense counsel"); Lafler, 566 U.S. at 173 ("An inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel."); cf. Menna v. New York, 423 U.S. 61, 62 n.2 (1975) (counseled guilty pleas do not "inevitably 'waive' all antecedent constitutional violations").

### 1.     Counsels' advice to accept a stipulated bench trial.

After the trial court granted a severance of the trials for the Still and Greaves-Johnson murder charges and after jury selection began in Eichinger's trial for the Jennifer Still murder,

counsel negotiated an agreement with the prosecutor that if he stipulated to the evidence for all four murders, including the Still murder, the prosecutor would agree not to argue that his failure to plead guilty was inconsistent with his assertion that he accepted responsibility. Eichinger asserts that entering into this agreement constituted ineffective assistance of counsel, focusing on a letter the Commonwealth sent to trial counsel just prior to trial that stated:

> The Commonwealth has agreed to your Motion for Severance in the [Eichinger] case. As I have repeatedly argued to you, I consider the defendant's desire for severance to be a tactical mistake which will increase the probability that he will receive the death penalty. . . . [I]n order to provide an incentive for the defendant to withdraw his Motion for Severance, the Commonwealth has offered to permit the jury to hear that he did not contest his guilt in the four murders. Normally, all that is admissible is the fact of conviction, not the lack of contesting. Thus the Commonwealth's offer would allow the defendant to increase his chance for receiving life in prison rather than the death sentence.

(A328-29 (Pet. PCRA Ex. 2) (paragraph break omitted).) Eichinger asserts that trial counsels' understanding of the Commonwealth's offer was that, if the defense wanted to argue remorse and acceptance of responsibility in the capital penalty phase, he could not first present any defense to any of the charges in either severed case via a contested trial but rather had to stipulate to all the evidence against him because there was a "quid pro quo," "all-or-nothing" "type of deal that was being presented [by the Commonwealth]" "predicate[d]," "condition[ed]," and "contingent on defendant having stipulated trials for both the 1999 homicide and 2005 homicides." (See N.T.

6/17/11 at 63-67[6]; N.T. 7/6/11 at 11[7]; N.T. 7/21/11 at 9[8]; N.T. 10/25/11 at 29-30[9], 35.[10]) He asserts

that trial counsel also understood the offer as requiring the defense to first receive permission from

---

[6] Trial co-counsel Paul Bauer testified:

Q.      The Still case was being tried separately by a separate jury, wasn't it?

A.      They were two separate trials, that is true.  But Mr. Castor wasn't going to agree to allow us to argue remorse and that we stirred the family, the problems of testifying, unless it was an all or nothing deal.

Q.      Is it your understanding that you needed Mr. Castor's agreement to argue remorse?

A.      Not to argue remorse, but the way that we were going to make the argument, or the way we were supposed to make the argument is that essentially it almost amounted as if it was a plea, so we didn't put the family through that process.  That's how they were going to argue remorse.

. . .

Q.      . . . Let's say John went to trial in the Still case and was convicted, so there was no stipulation. Under what theory could the Commonwealth have then argued to the jury in the capital case that he didn't show remorse by taking the Still case to trial?

A.      I think you're missing a misunderstanding.

        The argument we were making with respect to remorse was remorse with respect to the Greaves murder, not the Still murder.  So the fact that we were stipulating to the trial for the Still murder was almost like a condition of us being able to argue the remorse to the jury in the Greaves murder.

Q.      Who made that a condition?

A.      Mr. Castor.

Q.      So it would be your position — sorry — would it be your position that if Mr. Eichinger had gone to trial in the Still case and was convicted, you would not have been able to argue remorse in the capital case? . . .  It appears to me you are lumping the two cases together as a package that you had to do with Mr. Castor.  Is that a correct assessment?

A.      The two cases were certainly discussed and disposed of together.  That was

certainly done.

We needed — and when I say "we," myself and Mr. McElroy — we needed every bit of help we could possibly get in the penalty phase of the Greaves murder, every bit of help we could get.

And it's overwhelming research that juries consider the number one factor in making decisions on life-and-death the remorse of the defendant. That was something that's been out there and we were aware of that. So we were taking every step we possibly could to ensure that we could argue that he was remorseful.

THE COURT: Mr. Bauer, isn't it true that Mr. Castor's agreement to let the penalty phase jury hear from the very beginning in jury selection that your client did not contest and offered no defense to the killings, which is what you were seeking — and for Mr. McElroy be allowed to argue that in his opening statement, and so on and so forth, at the penalty phase — that was all contingent on Mr. Castor getting the stipulated bench trial in both homicides? So if you wanted to go to trial in the Still case, you would not have gotten what you and Mr. McElroy believed to be the huge benefit of letting the jury know from the very beginning, from the language that we had in the voir dire, that he did not contest and offered no defense to the killings. Isn't that correct?

THE WITNESS:        That's correct.

[7] Trial Counsel McElroy testified:

Q.        In light of some of the evidence that you reviewed for the Jennifer Still case that pointed to a third-party perpetrator, what reason did you have for not taking the Still case alone to trial?

A.        Well, he confessed to that one. And I guess in the whole scheme of things, the totality of the circumstances, it probably does go hand in glove with this, Exhibit 2, the quid pro quo, to show an expressed remorse.

[8] Bauer also testified:

Q.        Before Mr. Eichinger stipulated to the evidence in both cases, did you tell him that, if he took the Still case to trial separately, that the defense would be precluded from arguing remorse in the capital case?

A.        Yes. He was aware of the fact that, again — this is what we were going over for a while last testimony, that he was aware that it was an all-or-nothing type

the Commonwealth to argue remorse as mitigation in the capital penalty phase. (N.T. 2/8/11 at 92[11]; N.T. 6/15/11 at 61-62.[12])

---

of deal that was being presented, quote, unquote.

[9] Bauer testified:

I don't believe there was a lot by way of mitigation that Mr. McElroy had that would have, in my opinion, outweighed any aggravating factors that may have existed for a jury to decide. I think I was concerned — we were both concerned about that. So the fact that we could argue remorse, and if the jury believed that truly remorse was something that our client had, that that might save his life.

[10] Bauer testified:

[A]t that particular time when we were doing the stipulation, I did explain to him that if we were going to proceed with this chosen strategy, that severance was not possible because it was an all-or-nothing strategy.

[11] McElroy testified:

Q.    Were you aware that Mr. Eichinger could have pled guilty and still preserved his appellate rights to challenge the confession?

A.    I wasn't aware of that.

[12] Referring to Exhibit 2, Bauer testified:

Q.    Looking at the third paragraph on page one, do you see where it says, "Additionally, we were to provide an incentive for the defendant to withdraw his motion for severance. The Commonwealth has offered to permit the jury to hear that he did not contest his guilt in the four murders."

Do you see that?

A.    Yes.

Q.    Is that the language you are talking about, the condition that if he forwent trial, he would be able to say he accepted responsibility?

Eichinger alleges that trial counsel used the Commonwealth's plea offer to force him to stipulate to all charges, even though he always wanted to go to trial in both cases. (Am. Pet. ¶¶ 56-63.) He argues that the advice trial counsel gave him regarding the Commonwealth's offer was erroneous as a matter of law because: (1) trial counsel advised him that the Commonwealth could limit the mitigation presentation if he did not withdraw the severance grant and stipulate to all the charges in both cases; (2) this advice was based on the Commonwealth's "offer[] to permit the jury to hear that he did not contest his guilt . . . ." (A328 (Pet. PCRA Ex. 2 at 1)); and (3) trial counsel confirmed that their understanding of the law was that they "did need [the Commonwealth's] agreement" to "present to the jury that [Eichinger] did not contest the evidence" (N.T. 6/15/11 at 79-80[13]). He argues that counsels' endorsement of the Commonwealth's "offer"

---

A.      Yes.

[13] McElroy testified:

Q.      . . . Are you aware that you didn't need the Commonwealth's agreement in order to present to the jury that John did not contest the evidence?

A.      No, no.

Q.      You believe you did?

A.      Because we wanted to preserve the appellate issues.

Q.      Did you believe back in 2005 that you needed the Commonwealth's agreement to present to the jury that Mr. Eichinger did not contest the evidence?

. . .

THE WITNESS:      I did need their agreement. We went to the suppression hearing. Our motion was denied. We wanted to preserve it. You either go to trial to preserve it. If you pled guilty, I believe you give up that right to challenge the suppression motion later on. If you have a stipulated bench trial, you preserve the motion. If I had a stipulated bench trial and I still tried to offer to the jury, Listen, he accepted responsibility, it can be rebutted by the fact of recalling the detective:

misapprehended a basic canon of capital sentencing jurisprudence: that the sentencing jury may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978) (emphasis in original). See Eddings v. Oklahoma, 455 U.S. 104, 114 (1982) (same); Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (same). Thus, he concludes, the Commonwealth's offer to "permit" him to present mitigation was nothing more than what the law already allowed, evidence of an agreement not to contest the charges against him would have been admissible, relevant mitigating evidence without any "agreement" on severance, and the defense no more needed the Commonwealth's permission to argue remorse as a mitigating circumstance than it needed permission to argue other mitigation defenses in its closing. Yet, he asserts, trial counsel erroneously advised him that he needed the Commonwealth's permission to present mitigation that flowed directly from the nature of the *nolo contendere* plea and that the only way to secure that permission was to sacrifice his trial rights in two separate cases. (Pet. Mem. at 17-18.)

We find that this argument misapprehends trial counsels' explanation for their trial strategy and ignores state court factual findings on the issue. The record shows that counsel did **not** believe they required the Commonwealth's "permission" to present mitigation evidence; rather they

---

Detective, were you present in court? Yes, I was there. What happened? We went through a stipulated bench trial. Would you describe what that is. Well, we put on our case, they say nothing, and the judge finds him guilty. So are you certain, detective, the judge found him guilty as opposed to him admitting his guilt? That would have been the questioning, so it would have really negated our proffering Oh, he accepted responsibility.

That's how I saw it playing out, unless I got to say to the jury that he accepted responsibility without it being contested by the Commonwealth.

advised Eichinger to agree to the stipulated bench trial for two interrelated reasons: to preserve suppression issues for appellate review while still being free to support their mitigation argument. As counsel testified, had Eichinger not agreed to a stipulated trial preserving his appellate rights and counsel then asserted his acceptance of responsibility as mitigation, the Commonwealth could have presented readily available evidence to show that his acceptance was not genuine. The stipulation, therefore, was not in exchange for an illusory promise by the Commonwealth. Under Pennsylvania law, had Eichinger entered a guilty plea, he would have waived his appellate rights on the suppression issues. See, e.g., Commonwealth v. Monaco, 475 A.2d 843, 847 (Pa. 1984) (holding that "[t]he entry of a plea of guilty operate[s] to waive all non-jurisdictional defects and defenses") (citations omitted); Commonwealth v. Dickens, No. 568 MDA 2016, 2017 WL 588190, at *2 (Pa. Super. Ct. Feb. 14, 2017) ("[I]t is well-established that 'upon entry of a guilty plea, a defendant waives all claims and defenses other than those sounding in the jurisdiction of the court, the validity of the plea, and what has been termed the "legality" of the sentence imposed.'" (quoting Commonwealth v. Eisenberg, 98 A.3d 1268, 1275 (Pa. 2014)); Commonwealth v. Faust, 471 A.2d 1263 (Pa. Super. Ct. 1984) (holding that, by entering a guilty plea, defendant waived ability to challenge trial court's ruling on his pre-trial suppression motion). Had he proceeded to a contested guilt phase trial to preserve the suppression issues, his acceptance of responsibility/remorse mitigation argument would have, in counsels' opinion, been less effective. The attorneys viewed the stipulated bench trial as the best compromise to effectuate their goal of avoiding the death penalty. Their decision was not based on a belief that they were **prevented** from arguing mitigation absent a guilty plea or agreeing to the stipulated bench trial, but rather was based on their considered belief about how to most effectively pursue their ultimate strategy

to spare Eichinger's life while preserving appellate issues. The PCRA Court found as fact that

Attorney Bauer

> believed that the best way to be able to argue remorse was to proceed with a
> stipulated trial rather than a degree of guilty hearing. [] Mr. Bauer did explain the
> implications of the stipulated trial, and that if [Petitioner] was found guilty of the
> Still murder that that would automatically constitute an aggravating circumstance
> for the Greaves murders. [] Mr. Bauer opined that the stipulated trial would be the
> best strategy from which to argue remorse in order to save Appellant from a death
> sentence.

(A89 (record citations omitted).) Accordingly, the state court's determination that counsel had a

reasonable basis for pursuing this strategy is not an unreasonable determination of the facts in light

of the evidence presented.

Neither is the state courts' legal conclusion an unreasonable application of <u>Strickland</u>. The

PCRA court found that counsel acted reasonably in focusing on saving Eichinger's life by being

able to argue remorse to the penalty phase jury and to preserve appellate issues. (A86.) Given the

factual predicate established by the PCRA Court's evidentiary hearings, its finding that trial

counsels' strategy was within the "wide range of professional assistance" contemplated by

<u>Strickland</u> was not unreasonable. The PSC's rejection of Eichinger's argument on the decision to

opt for a stipulated bench trial, which incorporated the PCRA Court's findings of fact, is also not

an unreasonable application. Its conclusion that trial counsels' approach to the guilt phase was

"entirely reasonable" given that trial counsel was presented with overwhelming evidence of guilt,

including DNA evidence, confessions to police, and Eichinger's own writings describing both

incidents in detail (A198), provides a sufficient explanation for why the <u>Strickland</u> standard had

not been unreasonably applied. <u>See</u> <u>Florida v. Nixon</u>, 543 U.S. 175, 192 (2004) (holding that

counsel was not ineffective for conceding client's guilt at trial and "attempting to impress the jury

with his candor and his unwillingness to engage in a 'useless charade'") (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 657 (1984)).

        **2.     Incomplete advice as to the consequences of the plea; ineffectiveness for failing to object to the trial court's plea colloquy securing Eichinger's waiver of his constitutional rights.**

        Eichinger next argues that, independent of issues concerning the efficacy of the trial court's waiver colloquy, trial counsel had a duty to fully advise him of the ways in which their recommended course of action would affect his guilt phase and penalty phase rights. He argues that trial counsel failed to inform him of critical trial rights that he would be waiving if he agreed to the Commonwealth's plea offer. (<u>See</u> Am. Pet. at ¶ 89 (asserting trial rights that trial counsel allegedly omitted from their advice or erroneously advised upon, including the right to contest the voluntariness of his confession before the jury, to present evidence of diminished capacity, that Eichinger could still argue acceptance of responsibility if he contested guilt, and the effects of a finding of guilt on the Commonwealth's burden to prove aggravating factors in the penalty phase).) He asserts that counsels' failure to explain the legal consequences of their stipulated trial plan meant that he could not make a reasonably informed decision regarding whether to plead or continue with trial. While counsels' effectiveness is independent of the issue of whether Eichinger's waiver was voluntary, <u>see</u> <u>Frye</u>, 566 U.S. at 141, for clarity we will first discuss whether the trial court's plea colloquy was inadequate.

        The right of a criminal defendant to be tried by a jury of his peers is a fundamental constitutional right, <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968), and the waiver of that fundamental constitutional right must be knowing and voluntary. <u>Boykin v. Alabama</u>, 395 U.S. 238, 242-243 (1969). "The Supreme Court has repeatedly emphasized the importance of a criminal defendant's

Sixth Amendment right to a trial by jury and that this right may only be ceded by a knowing, voluntary, and intelligent waiver." Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 850-51 (3d Cir. 2017), as amended (July 18, 2017), cert. denied sub nom. Vickers v. Link, 138 S. Ct. 685 (2018) (citing Schneckloth v. Bustamante, 412 U.S. 218, 236-37 (1973); Adams v. U.S. ex rel. McCann, 317 U.S. 269, 276-77 (1942)).

The inquiry into whether a jury trial waiver is knowing and voluntary has two distinct elements. Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted). First, the waiver of the right must have been knowing and voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." Id. "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to [waive] it." Id. Eichinger argues that the jury trial waiver and agreement to stipulate to the Commonwealth's evidence was invalid because (1) counsel did not fully explain to him the jury trial rights he was waiving, (2) the trial court's oral colloquy was insufficient because it was "cursory" and omitted an explanation of several constitutional rights, and (3) given the circumstances surrounding his "sudden" decision to waive a jury trial after jury selection had already commenced, the trial court should have "canvass[ed] the defendant with the 'utmost solicitude of which courts are capable" to ensure he had a full understanding of his decision during the oral colloquy. (Pet. Mem. at 69 (quoting Boykin, 395 U.S. at 244).)

Subparts (2) and (3), which focus upon deficiencies in the trial court's oral colloquy, are meritless because there is no clearly established federal law as determined by the Supreme Court that requires an on-the-record oral colloquy with a defendant before a trial court accepts his jury waiver as knowing and intelligent. See United States v. Lilly, 536 F.3d 190, 197 (3d Cir. 2008) (stating that, while an on-the-record colloquy is preferred, "no such colloquy is required under

[Fed. R. Crim. P] 23(a) or constitutional law . . ." (citing <u>United States v. Anderson</u>, 704 F.2d 117, 119 (3d Cir. 1983).)  What is required by clearly established federal law is that the record disclose that the waiver is knowing, voluntary, and intelligent.  <u>Boykin</u>, 395 U.S. at 244.

On the waiver issue PSC made the following findings of fact:

> Appellant waived his right to a guilt phase jury after thorough oral and written colloquies.  NT Trial, 10/18/05, at 4-8.  He orally affirmed he understood he had a right to a jury trial, the jury would be comprised of members of the community, he would participate in the selection of the jury, and in order to be convicted each member of the jury must be convinced of his guilt beyond a reasonable doubt.  Id., at 5-6.  He also reviewed and signed a written jury waiver form, which reiterated the rights already explained to him.[14]  <u>Id.</u>, at 4-5.  He repeatedly affirmed he understood the written form and the rights explained to him by the court, and that he had not suffered from any mental illness capable of impairing his ability to understand the proceedings.  <u>Id.</u>, at 7.

(A171.)  The Court also quoted the transcript of the on-the-record colloquy:

> I understand that you have authorized your attorneys to not contest [the] trial and offer no defense to the four charges of first-degree murder and related offenses.  This means that you will not be confronting the witnesses against you, and you are giving up your right to cross-examine those witnesses and to otherwise seek to impeach their testimony. . . .  Do you understand that?

---

[14] The written jury waiver form provided:

> AND NOW, this 18th day of October, 2005, comes the Defendant and pleads not guilty, and with the consent of his/her attorney, and the attorney for the Commonwealth and the approval of the Court, waives a jury trial and elects to be tried by the Judge without a jury, fully understanding that if he/she were tried by a jury:
>
> a)   the jury would be chosen from members of the community thereby producing a jury of his/her peers,
>
> b)   any verdict rendered by a jury must be unanimous and,
>
> c)   he/she would be permitted to participate in the selection of the jury panel

(Docket Entry 104-211.)

This means that you will be exposed to the death penalty. That a penalty-phase only jury will be selected, and that jury will be told by your attorney that you did not contest and offered no defense to the first-degree murder charges in the guilty or not guilty proceedings. They will then argue these facts as mitigation. Do you understand this and agree to it?

Id., at 9-10. The trial court explained the law on murder, and appellant replied he understood the law as explained. Id., at 11-15. The trial court asked appellant, "Now then, do you understand the charges that you are [faced with] today and the possible penalties?" Appellant replied that he did. Id., at 15. The trial court, with the prosecutor's assistance, described the other crimes with which appellant was charged and their penalties. Id., at 15-18. The trial court stated, "[A]ll the penalties could be imposed consecutively. Do you understand that?" Id., at18. Appellant responded he did. Id.

The trial court then asked:

You understand that by waiving a jury trial and proceeding in accordance with the advice of your attorneys, that you will be found guilty beyond a reasonable doubt of four counts of first-degree murder and related offenses. Do you understand that?

Id. Appellant replied he understood. Id. To be sure, the trial court asked him again, "You understand and agree to that?" Id. Appellant said yes again. Id., at 19. The trial court then asked, "And you understand the consequences of your decision today?" Id. Appellant said yes. Id. The trial court then went through the procedure of the prospective capital sentencing hearing. Id. Appellant replied yes every time the court paused to ask if he understood what was explained. The trial court gave appellant an opportunity to ask questions; he declined. Id. Once the trial court finished its colloquy, trial counsel examined appellant on the record. Trial counsel asked whether appellant understood the juries would be dismissed, whether he and trial counsel had reviewed the rights implicated by the trial court's colloquy prior to coming to court, whether appellant had understood those rights, and whether he had any questions. Id., at 20-21. Appellant replied yes to every question and declined to ask further questions. Id.

(A173-74 (quoting N.T. 10/18/05 at 4-22).) Based on this record, the Court concluded that there was no merit to the argument "that the process used to secure [the] guilt phase jury waiver, or the process by which [Petitioner] elected to stipulate to the evidence, was constitutionally defective. Accordingly, counsel cannot be deemed ineffective regarding this issue." (A175.)

We find that the PSC's findings of fact were reasonable in light of the evidence presented and its legal conclusion was a reasonable application of <u>Boykin</u> and <u>Strickland</u>. The Court's findings of fact establish that the jury waiver and the stipulation were knowing, voluntary and intelligent. We reject Eichinger's argument that the colloquy was defective because the trial court did not specifically tell him he had a right to testify in his own defense and contest the charges against him and did not explain that the jury must unanimously agree on each fact necessary to prove the elements of the crimes charged. (Pet. Mem. at 65-66.) First, while he cites Supreme Court decisions holding that these are fundamental rights of the accused, Eichinger does not cite cases to show that the Supreme Court has found that the failure to include these specific statements in an on-the-record oral colloquy renders a jury trial waiver faulty under clearly established federal law. That an on-the-record colloquy is not even required subsumes the issue of whether specific statements are talismanic during such a colloquy. Second, the PSC's finding that the colloquy included admonitions that "each member of the jury must be convinced of his guilt beyond a reasonable doubt" was sufficient to convey to Eichinger that, absent his waiver, a jury would be required to find that the Commonwealth had proved the elements of the offenses beyond a reasonable doubt. The admonitions that he was giving up his right to confront witnesses and would be able to offer no defense were sufficient to convey to him that he waived the right to testify in his own defense and otherwise contest the charges.

The independent issue of whether counsel rendered ineffective assistance in advising Eichinger to accept the stipulated bench trial is premised upon his assertion that counsels' advice was incomplete. (Pet. Mem. at 22.) He argues that the failure to explain the legal consequences of counsels' stipulated trial plan meant that Eichinger could not make a reasonably informed decision regarding whether to plead or continue to trial. (<u>Id.</u> at 23.) Before the PCRA Court, he

argued that counsel failed to ensure that he had an actual understanding of each constitutional right he was waiving because, after the trial court conducted its colloquy, told him that there would be no jury and that he would offer no defense, enumerated the elements of the charges, and "gave counsel an opportunity to provide any further explanation, . . . [a]t that point, counsel failed to ensure that the waiver of [his] rights to [a] jury determination of the facts necessary for conviction and to testify in his own defense were [sic] knowing, voluntary and intelligent." (A2831-32.) The PCRA Court found as fact that this assertion was meritless. It quoted from the waiver proceeding where counsel took the "opportunity to provide any further information" after the Court's own colloquy:

> MR. BAUER: Just briefly. John prior to filling out that form, did you and I and Mr. McElroy have an opportunity to go over the contents of that form?
>
> [Appellant]: Yes.
>
> MR. BAUER: And did you understand that by exercising that waiver of a jury trial, you are giving up three very important rights. Do you understand that?
>
> [Appellant]: Yes.
>
> MR. BAUER: And those rights are listed on that form, and I just want to make sure that I go over then with you again. Number one, you are giving up — that you would have the right to have a jury to be chosen from members of the community, thereby, producing a jury of your peers. Do you understand that?
>
> [Appellant]: Yes.
>
> MR. BAUER: Do you understand that any verdict rendered by a jury must be unanimous, meaning that all 12 jurors must agree on a verdict in this case. Do you understand that?
>
> [Appellant]: Yes.
>
> MR. BAUER: And the third right you are giving up is that you would be permitted to participate in the selection of the jury panel. Do you understand that?
>
> [Appellant]: Yes.

MR. BAUER:  Did Mr. McElroy and I explain those rights to you?

[Appellant]:  You did.

MR. BAUER:  And did you then execute that waiver of jury trial form?

[Appellant]:  Yes.

MR. BAUER:  Do you have any questions before the Court were to rule on that waiver of jury trial?

[Appellant]:  No.

(A84-85 (quoting N.T. 10/18/05 at 5-7).)  We find that the PCRA Court's presumptively correct factual finding that counsel informed Eichinger of the essential elements of the jury rights he was waiving, see 28 U.S.C. § 2254(e)(1), has not been rebutted by clear and convincing evidence.  The legal determination that counsel were not ineffective for failing to render complete advice is not an unreasonable application of Strickland.

Eichinger also argues that counsel was ineffective for failing to investigate mental health or cognitive issues that might affect his ability to make a knowing, voluntary and intelligent decision.  (Pet. Mem. at 72-73.)  Given the state courts' findings of fact that Eichinger did not suffer from any mental health issues, discussed in detail below, we find that this argument is meritless as well.

>    **3.    Failure to investigate guilt phase defenses before advising on jury waiver.**

Focusing on specific testimony from the PCRA evidentiary hearing, Eichinger argues that Attorney McElroy admitted that, just one day after his appointment, he concluded that Petitioner

was guilty of all charges, and he therefore immediately settled on his trial plea strategy.[15] McElroy further admitted that he had not done any guilt phase investigation prior to making this decision.[16] Nor did he, or any member of the defense trial team, conduct any independent investigation into factual or legal defenses for either case following his decision.[17] Also, Eichinger asserts, counsel did not consult with an expert about any mental health-based guilt phase defense.[18] He argues that, because trial counsel did not investigate any guilt phase defense for either case prior to advising him to waive severance and stipulate to all charges, their advice to do so was inherently unreasonable.

The PCRA Court, considering the entire record presented at the hearings, rejected the failure to investigate claim concerning the mental health issues finding that

> The evidence adduced at the PCRA Hearings revealed that trial counsel did contemplate various mental health defenses, but that under the facts of this case, they were not viable, They based this determination upon the facts of the case

---

[15] See N.T. 2/8/11 at 23 ("I think all along, it was never going to be — I didn't see it as going to be a trial. And I think Mr. Eichinger is in agreement with that. It was strictly just going to be penalty phase.".)

[16] See N.T. 6/15/11 at 47 ("Q. Had you conducted any investigation prior to that point with respect to the allegations in the probable cause statement for the Greaves-Johnson case? A. No.")

[17] See N.T. 2/8/11 at 57 ("Q. What do you recall the first steps that you took to investigate the guilt phase, not the penalty phase, but the guilt phase of the Greaves/Johnson case? A. The discovery that was provided to me. Q. What about independent of the discovery provided to you, what steps did you take to investigate for the guilt phase of the Greaves/Johnson case? A. None that I can recall."); id. at 69 ("Q. The Greaves/Johnson case you contacted Doctor Reid about a physical impossibility defense, right? That couldn't be supported by Doctor Reid. A. Correct. Q. Now, what other defenses were you considering for the Greaves/Johnson guilt phase? A. None."); see also id. at 83-84; N.T. 3/14/11 at 103, 126.

[18] See N.T. 6/15/11 at 11 ("Q.… Had you talked to an expert about any mental health based defenses? A. Did not, to any expert about any mental health defenses in the guilt phase, no. . . . In their reports I just didn't see where there was any. There was nothing that jumped out of the report that said he wasn't competent at the time to stand trial and/or was insane at the time that the acts were committed.").

which were replete with evidence of deliberation and premeditation; their interaction with Appellant which showed Appellant to understand the nature of the charges, the nature of the proceedings, his ability to participate in his defense and his asking appropriate questions and answering with relevant answers; a review of Appellant records which demonstrated Appellant to be a high school graduate with some college education, Appellant's ability to hold down a job with Acme supermarket for many years and perform well enough to warrant an advancement, his participation in Boy Scouts and a stable home life with an involved mother and father. There was nothing to indicate a need for competency testing, neurological testing or psychiatric testing. Both Mr. McElroy and Mr. Bauer considered mental health defenses, but as Mr. Bauer testified he did not want to argue meritless defenses to the jury in order to maintain credibility.

(A77-78.) The PCRA Court relied on this same reasoning to the extent that the mental health issues overlapped with the separate issue of counsels' alleged failure to investigate defenses prior to advising Eichinger to accept a stipulated bench trial. (A90.) The court also reasoned that the issue overlapped with the separate claim that the jury trial waiver was not knowing, intelligent and voluntary because counsel failed to develop the case for cognitive limitations, stating that counsels' strategy

> was taken in light of the lack of any mental health defenses and the overwhelming evidence against Appellant, including DNA evidence, Appellant's multiple confessions, journal entries describing the [sic] detail murders in Appellant's own hand. Given these circumstances Mr. McElroy and Mr. Bauer focused on saving Appellant's life by being able to argue remorse to the penalty phase jury and to preserve appellate issues.

(A86.) The court continued:

> The strategy to waive a jury trial and the strategy to proceed to a stipulated trial were the same. Trial counsels' strategy took shape in light of the overwhelming evidence against Appellant and the goal of saving Appellant from a death sentence. Counsel believed that it would be more useful to be able to argue remorse to the jury at the penalty phase; rather than contesting all of the overwhelming evidence.

(A88.)

The PSC, after first acknowledging that "[c]ounsel has a general duty to undertake reasonable investigations or make reasonable decisions that render particular investigations

unnecessary," agreed that trial counsels' "approach to the guilt phase of this case was entirely reasonable." (A198 (citing Commonwealth v. Cox, 983 A.2d 666, 692 (Pa. 2009).) It noted that counsel were presented with overwhelming evidence of guilt, including confessions, DNA evidence, and Eichinger's own writings, and concluded "per the PCRA court's findings, there was no indication of any mental condition that would have called appellant's competence to stand trial into question. Therefore, trial counsel declining to investigate appellant's competence to stand trial or to pursue manifestly unmeritorious mental health defenses was a reasonable decision and did not constitute ineffective assistance." (A199.)

Notably, the PSC did not directly address a portion of the "failure to investigate" claim raised in the state petition and repeated here, concerning the failure to investigate factual defenses in the pretrial period prior to advising on the plea decision.[19] When a state's highest court does not address a claim that was adjudicated by the lower court, we "look through" to the last reasoned state court opinion, which is the PCRA Court's opinion. Ylst v. Nunnemaker, 501 U.S. 797, 803

---

[19] The issue was clearly raised by Eichinger in his Amended PCRA Petition and in his brief to the PSC. (See Am. 2254 Pet. at 71-73 ("[T]rial counsel did not undertake any independent investigation of the facts of the cases **or** Petitioner's mental and cognitive health. . . . Counsel was ineffective for failing to investigate before deciding: (1) not to present any defenses to the charges, including . . . a factual defense in the Jennifer Still case. . . . Neither trial counsel conducted any investigation into the facts of either case outside of the discovery provided by the prosecution. . . . Neither counsel investigated any factual defenses to the Jennifer Still case . . . even though they were provided with police reports identifying multiple alternate suspects with motives to kill Ms. Still.") (emphasis added, citation omitted); Pa. Supreme Ct. Brief of Appellant (A2481 ("Counsel was ineffective for failing to investigate before the stipulated bench trial. The undisputed record proves that counsel did not undertake any independent investigation of the facts of the cases **or** Appellant's mental health before the waiver/withdrawal of severance and stipulated bench trial. Counsel was ineffective for failing to investigate before deciding . . . not to present any defenses to the charges, including . . . a factual defense in the Jennifer Still case. . . ." (emphasis added))). Petitioner has also repeated the argument in his federal habeas petition. (See Pet. Mem. at 33 ("In focusing solely on counsel's trial strategy, the PCRA court unreasonably ignored that Petitioner's decision whether to plead guilty or go to trial in each case was independent from the decision as to what mitigation to present if the capital case reached a penalty phase.").)

(1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Saranchak v. Sec'y, Pa. Dep't of Corr., 802 F.3d 579, 597 (3d Cir. 2015) (reviewing Strickland prejudice "through AEDPA's lens" because PCRA Court adjudicated that prong on the merits even through PSC did not).

Much of the testimony elicited by Eichinger from his former attorneys at the PCRA evidentiary hearings focused on their failure to speak with fact witnesses to investigate the potential existence of other suspects in the Jennifer Still murder, to challenge the veracity of the police reports, to consider other defenses, and to develop evidence that was independent of the discovery provided by the Commonwealth prior to deciding upon their strategy to advise a waiver of a jury trial in the Still case. The PCRA Court addressed the deficient performance prong of this claim, ruling that "trial counsel had a reasonable basis for their strategy in advising [Eichinger] to waive his right to a jury trial . . . [because] [they] focused on saving [Eichinger's] life by being able to argue remorse to the penalty phase jury. . . . " (A86, 88-89.) Because the PCRA Court adjudicated the deficient performance prong on the merits, AEDPA review would apply to that prong. However, neither the PCRA Court nor the PSC addressed the prejudice prong. For review of that issue, we employ a de novo standard. Rompilla v. Beard, 545 U.S. 374, 390 (2005) ("Because the state courts found [trial counsel's] representation adequate [under Strickland's first prong], they never reached the issue of prejudice, . . . and so we examine this element of the Strickland claim de novo."); Abdul-Salaam, 895 F.3d at 266 ("Where, as here, the state court specifies that it based its ruling on one prong of a test, we do not apply deference to hypothetical theories that could support a decision based on the other prong, which the state court explicitly did not reach.")

Federal law clearly established by the Supreme Court holds that where there is a failure to conduct a reasonable investigation before deciding on a particular trial strategy, counsels' strategic choice is not entitled to deference, and the failure can satisfy the deficiency prong. Strickland, 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," but an unreasonably limited investigation informing those strategic choices can amount to deficient performance); see also Wiggins v. Smith, 539 U.S. 510, 522-23 (2003) (appropriate focus is on whether investigation supporting trial decision was itself reasonable); id. at 525 (investigation "was necessary to making an informed choice among possible defenses"); Sears v. Upton, 561 U.S. 945, 953 (2010) (State court's "determination that counsel had conducted a constitutionally deficient mitigation investigation should have, at the very least, called into question the reasonableness of this theory. . . . The 'reasonableness' of counsel's theory was, at this stage in the inquiry, beside the point: [the defendant] might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not."); see also Abdul-Salaam, 895 F.3d at 268 ("Counsel can make a strategic decision to halt an avenue of investigation if he has completed a foundation of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called 'strategic' when counsel 'fail[s] to seek rudimentary background information.'" (alteration in original) (quoting Bond v. Beard, 539 F.3d 256, 289 (3d Cir. 2008)).

Eichinger argues *inter alia* that the PCRA Court opinion was contrary to, or involved an unreasonable application of, clearly established federal law

> because it did not account for trial counsel's admitted absence of any investigation into plausible defenses. In the absence of an adequate investigation, the decision to focus on a particular trial strategy cannot be reasonable. . . . The PCRA court's determination that trial counsel's advice to Petitioner was reasonable in the absence of an investigation misapplied [] clearly established Supreme Court precedent.

(Pet. Mem. at 35 (citation omitted).)  The Commonwealth responds that counsel made reasonable strategic decisions not to further investigate diminished capacity and third-party perpetrator defenses, and the strategy to stipulate to the evidence was well-within "the wide range of professional assistance."  (Resp. at 32 (quoting Strickland, 466 U.S. at 689).)  It stresses that Eichinger repeatedly confessed, lost his suppression motion, stood no realistic hope of avoiding four first-degree murder convictions, and by accepting counsels' advice to stipulate to the evidence, he preserved those suppression issues for appeal yet still enabled his attorneys to argue at the penalty hearing that he had, from the time of his confessions, accepted responsibility for his crimes.  Id.

We hold that the state court resolution of the failure to investigate claim was a reasonable application of Strickland's deficiency prong.  First, counsel testified that, prior to making the decision to advise Eichinger to accept a stipulated bench trial, they both concluded there were no viable mental health or other defenses for the guilt phase of trial for any of the four murders.  (N.T. 10/25/11, 6-10.[20])  Even without granting counsels' advice to waive a jury trial and stipulate to the Commonwealth's evidence any AEDPA deference, the factual record establishes trial counsel were able to state a coherent rationale for their strategic choice — preserving appellate issues and strengthening mitigation arguments.  While the failure to conduct an independent defense investigation prior to deciding on the strategy removes the requirement that we afford that choice deference, a *de novo* review of the record establishes that counsels' performance was not deficient. Both attorneys testified that pursuing a guilt phase jury trial was hopeless given the overwhelming

---

[20]  Bauer testified that he and McElroy discussed the possibility of presenting a mental health defense but "nothing in the record supported that, nothing in our conversations with Mr. Eichinger supported that."  (N.T. 10/25/11 at 6.)  They also explored an alibi defense, self-defense, and issues that might have reduced the crime down from first degree murder and found no cause to present such defenses.  (Id. at 9-10.)

evidence of guilt and that contesting guilt would have been damaging to Eichinger's ability to persuade that same jury to spare his life in a subsequent penalty phase trial. While current counsel focus on the lack of investigation to argue that this removes the AEDPA presumption that counsels' choice should be respected, as we now explain Eichinger fails, even in hindsight, to persuade this Court that the premises upon which that choice was made was improper since it remains that the Commonwealth's evidence of guilt was overwhelming and he had no viable guilt phase defenses.

### a. Defenses to Jennifer Still's Murder

The only guilt phase defenses raised by Eichinger in his federal habeas petition as a source for challenging trial counsels' performance are (1) the possibility of other suspects responsible for Jennifer Still's murder and (2) diminished capacity defenses. Focusing first on his conviction for the Still murder, we find on *de novo* review that Eichinger has failed to show that the failure to investigate constituted deficient performance or prejudice. Notably, Eichinger requested discovery in this Court on this issue, seeking any evidence in the Commonwealth's possession concerning other suspects in the Still murder. (See Docket Entry 67.) The Commonwealth turned over discovery information after a conference with the Court. (See Docket Entries 97, 98, 99.) Thereafter, Eichinger requested an evidentiary hearing on certain issues raised in his federal petition but guilt phase defenses for the Still murder conviction was not one of them and he has not further pursued his discovery request to attempt to show that there were overlooked viable defenses to Jennifer Still's murder based on the discovery material he received. (See N.T. 3:17-24; 8:10-21; 9:22-10:5 (requesting evidentiary hearing (1) to call expert to rebut PCRA evidence of future dangerousness, and (2) to recall trial counsel concerning cross-examination of Commonwealth's mitigation expert).) We cannot, therefore, conclude that the failure to

investigate Still's murder establishes deficient performance or prejudice arising from counsels' strategy to have Eichinger waive his guilt phase jury rights and stipulate to the Commonwealth's evidence. Nor, for the same reasons, can we conclude that the Still conviction was improper so as to invalidate the death sentences imposed for the Greaves-Johnson convictions, for which the Still conviction was determined to be an aggravating factor.[21]

Second, we also must recognize the fact that even if he had contested the non-capital murder count for the killing of Jennifer Still, Eichinger has offered no basis for showing that counsel ignored viable actual innocence guilt phase defenses with regard to their advice vis-à-vis the Greaves-Johnson murders. Since the suppression issues counsel sought to preserve for appeal concerned all the counts of conviction, any alleged error in failing to investigate the Still murder had no bearing on their advice for the capital counts.

### b. Mental Health Defenses

With regard to ineffective assistance of counsel arising from mental health-based guilt phase defenses, the PSC held:

> Trial counsel's approach to the guilt phase of this case was entirely reasonable. Upon assuming appellant's representation, trial counsel were presented with overwhelming evidence of his guilt, including DNA evidence, confessions to police, and appellant's writings describing both incidents in detail. The inculpatory statements also militated against an insanity or diminished capacity defense

---

[21] Pennsylvania is a "weighing state" in which the jury is to determine which statutorily defined aggravating factors have been proven beyond a reasonable doubt and weigh those factors against the mitigating factors the defendant has proven by a preponderance of the evidence. See 42 Pa. Cons. Stat. Ann. § 9711(c)(iii), (iv). In a weighing state, it is impermissible for a reviewing court to reweigh sentencing factors should an aggravating factor be found improper. See Stringer v. Black, 503 U.S. 222 (1992) (holding that "the difference between a weighing State and a nonweighing State is not one of 'semantics'" because in a weighing state "a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale"). Because Eichinger has failed to show deficient performance or prejudice in the Still conviction, the use of that conviction as an aggravating factor in the Greaves-Johnson penalty phase is not implicated.

because they explained appellant's purposeful intent behind the killings, ruining any possibility of claiming he did not understand the nature of his acts, or that he did not know they were wrong. See 18 Pa.C.S. § 315(b) (codifying common law M'Naghten rule as definition of legal insanity in Pennsylvania). Trial counsel tried to have the statements suppressed. However, as already discussed, the trial court properly determined they were admissible. Also, per the PCRA court's findings, there was no indication of any mental condition that would have called appellant's competence to stand trial into question. Therefore, trial counsel declining to investigate appellant's competence to stand trial or to pursue manifestly unmeritorious mental health defenses was a reasonable decision and did not constitute ineffective assistance.

(A198-99 (footnotes omitted).) The PCRA Court's findings incorporated by reference into the

PSC's discussion were that the:

[E]vidence adduced at the PCRA Hearings revealed that trial counsel did contemplate various mental health defenses, but under the facts of this case, they were not viable. They based this determination upon the facts of the case which were replete with evidence of deliberation and premeditation; their interaction with Appellant which showed Appellant to understand the nature of the charges, the nature of the proceedings, his ability to participate in his defense and his asking appropriate questions and answering with relevant answers; a review of Appellant records which demonstrated Appellant to be a high school graduate with some college education, Appellant's ability to hold down a job with Acme supermarket for many years and perform well enough to warrant an advancement, his participation in Boy Scouts and a stable home life with an involved mother and father. There was nothing to indicate a need for competency testing, neurological testing or psychiatric testing. Both Mr. McElroy and Mr. Bauer considered the mental health defenses, but as Mr. Bauer testified he did not want to argue meritless defenses to the jury in order to maintain credibility.

(A77-78.) While the PSC did not discuss the prejudice prong, the PCRA Court did, constituting

the last reasoned opinion on the issue:

Appellant's claim also does not entitle him to relief because he has not established prejudice because of trial counsels' alleged nonfeasance. The evidence adduced at the PCRA evidentiary hearings showed that Appellant did not have cognitive limitations or other mental health issues at the time of the murders or at the time of trial that could have minimized his involvement in them or that he was not fit to waive his right to a jury trial or waive his right to testify. Appellants called various experts to the stand during the evidentiary hearing for purposes of establishing that trial counsel was ineffective in preparing for the guilt phase. However, their testimony was skillfully dissected by the Commonwealth and found to be weightless with this Court. Additionally, this Court found the testimony of Dr.

O'Brien and Dr. Sacchetti, the Commonwealth's experts, to be credible. Neither of the Commonwealth's expert [sic] diagnosed Appellant with competency issues, mental health issues [or] cognitive impairments.

(A78.) The finding that Eichinger did not have cognitive limitations or other mental health issues at the time of the murders or at the time of trial are findings of fact entitled to the presumption of correctness. We find that he has failed to meet his burden to show by clear and convincing evidence that that these findings were an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Indeed, the record amply supports the PCRA Court's findings.

Attorney Bauer testified that his communication with Eichinger indicated to him that Petitioner understood the nature of the charges and the criminal process. (NT 6/17/11 at 6-7.) Bauer testified that Petitioner did not say anything that would indicate a thought disorder or an inability to understand what was happening. (Id.) Bauer conceded that he never investigated whether Eichinger may have suffered a childhood head trauma because his interaction with him showed he was capable of understanding and cooperating with the defense. (Id. at 8.) Bauer saw no sign of brain injury, and while Eichinger's family medical history includes two aunts with bipolar disorder, he did not investigate this area for the same reasons. (Id. at 8-10.) Since he was retained only to litigate the penalty phase, which never in fact occurred due to the decision to enter into a stipulated trial, he did not speak with the defense mental health experts Dr. Weiss and Dr. Blair prior to the stipulated trial. (Id. at 11-14.) He also testified that (1) he knew Eichinger's father had Alzheimer's, (2) he could not recall whether his mother had depression, (3) and he knew Eichinger thought of himself as a loner. (Id. at 14-15.) Bauer stated that these facts had no impact on his defense strategy since it was not relevant to the guilt phase issues. (Id. at 15.)

Attorney McElroy testified that he did not believe a legal insanity defense was viable since the journals Eichinger kept and his admissions showed he knew what he was doing when he committed the four murders. (NT 10/24/11 at 163-64.) Similar to Bauer, McElroy testified that Eichinger was able to actively participate in his own defense, and responded appropriately to questions, there was nothing to suggest he suffered from any paranoia or psychosis. (Id. at 6-8, 165-68.) Based on the evidence and his interactions with Eichinger, McElroy believed there was no basis upon which to seek the input of a mental health expert to assist with the defense. (Id. at 169.) Specifically, he testified that Eichinger did not appear confused, was never incomprehensible or incoherent, was capable of conveying his thoughts and concerns, did not appear to have difficulty concentrating, did not appear drowsy or have issues with staying alert, did not have difficulty understanding what they were discussing, and was able to knowingly, intelligently and voluntarily waive his right to a jury trial and enter into stipulations. (Id. at 110, 143-45.)

The expert evidence presented at the PCRA hearings also support the findings of fact. Eichinger called Dr. Jonathan Mack who opined that Petitioner suffers from brain damage dysfunction in the left temporal aspect of his brain compared with the right hemisphere likely caused by a car accident, when a tree limb fell on Eichinger's head, or Lyme disease. (N.T. 3/16/11 at 41-42, 47-54, 75-79.) He opined that these deficits implicated Eichinger's ability to control his emotions, make judgments and make appropriate responses to social cues. (Id. at 143, 80.) He diagnosed Eichinger as suffering from a personality disorder and an organic personality syndrome, and that at the time of the murders, he was in a state of extreme mental or emotional disturbance that impaired his capacity to conform his conduct to the requirements of law. (Id. at 89-90.) Dr. Mack conceded on cross examination, however, that Eichinger did not score in the impaired range

in any of the neuropsychological tests that he administered or that he was even mildly impaired in executive functioning or planning and response inhibition. (Id. at 95, 143-46.)

Dr. Ruben Gur, Eichinger's PCRA expert in neuropsychology and neuroimaging, opined that a PET scan of Petitioner's brain showed he suffered damage in the left hemisphere brain including the amygdala, hippocampus, insula, hypothalamus, corpus callosum, midbrain, and basal ganglia. (N.T. 11/30/11 at 47-48, 70-74.) He opined that Eichinger's PET scan results are consistent with decreased metabolism in the left temporal lobe. (Id. at 79-80.) These regions cause problems with memory, emotion regulation, deficits in planning, monitoring and adjusting behavior to context, and integrating behavior with emotion and motivation. (Id. at 80-81.) He believed the damage was the result of Lyme disease. (Id. at 82-83.) He conceded on cross examination that behavioral imaging methodology is primarily a research tool and not a clinical one, and the behavioral image methodology, which was patented in 1986, has not been updated to account for many of the tests administered by Dr. Mack. (Id. at 89-91.) He also conceded that a PET scan would not account for the effect of anxiety on metabolic activity exhibited at the time the scan was performed, and the scan, performed in 2009, was not necessarily a reflection of Eichinger's brain in 1999 or 2005. (Id. at 126-28, 138-40.) Finally, the Commonwealth established that Dr. Gur's results did not correlate with Eichinger's performance on neuropsychological tests, and Gur conceded that the facts of the case demonstrated impulse control, anticipation of negative consequence to behavior, goal formation, an intent to kill, awareness of right and wrong, and attempts to avoid detection. (Id. at 153-169.)

Finally, Eichinger called Dr. Jethro Toomer, a forensic psychologist, who opined that Petitioner suffered from symptoms of organic brain dysfunction and schizotypal personality disorders with schizoid and dependent traits at the time of the 2005 murders and was under the

influence of extreme mental or emotional disturbance. (N.T. 10/27/11 at 48, 79-81.) He further testified that Eichinger's capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law were substantially impaired. (Id.) He was, however, unable to opine whether Eichinger was competent prior to trial. (Id. at 111-12.) He conceded that the facts demonstrated Eichinger was able to form goal directed behavior, had an intent to kill, tried to avoid detection, was able to control his impulses, anticipated negative consequences, and knew it was wrong to kill. (Id. at 119-132.)

Dr. Jonathan O'Brien testified for the Commonwealth. Dr. O'Brien conducted a psychiatric evaluation of Eichinger. (N.T. 1/25/12 at 15.) He was retained by the Commonwealth to express an opinion regarding the presence or absence of a psychiatric or cognitive disorder diagnosis and to express opinions pertaining to mitigation, specifically (1) whether Eichinger was suffering from extreme mental or emotional disturbance as a result of a psychiatric or cognitive disorder at the time of the alleged offenses and (2) whether he was substantially impaired in his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. (Id. at 16:11-22.) He conducted a cognitive capacity screening exam and a mental status exam. (Id. at 19-20.) He also reviewed documents including medical records of Eichinger's family members, his education and employment records, the criminal case documents, transcripts, and court decisions, Eichinger's journals, correctional records, and trial expert reports. (Id. at 21-26.)

Dr. O'Brien testified that there was little documentation prior to the time of the penalty phase trial, other than Eichinger having symptoms and difficulty adjusting to prison prior to trial, to make a positive determination of prison adaptability. (Id. at 115.) He opined that using a prospective analysis, trying to predict Eichinger's prison adaptability based upon his behavior prior to trial, would be very speculative. (Id. at 115-16.) Dr. O'Brien opined that the only real predictor

that has been statistically shown to be reliable in terms of predictions done by mental health officials is prior behavior. (Id.) He added that the murders would be a major component of prior behavior that would have to be considered in predicting Eichinger's future behavior. (Id. at 116-17.) Dr. O'Brien disagreed that Eichinger's history of being a reliable worker and a rule follower as demonstrated in school, employment, and other records, indicated that he would positively adjust to prison because, he opined, Petitioner was susceptible to decompensation under stress, and prison life can be very stressful. (Id.)

Finally, Dr. Thomas Sacchetti testified for the Commonwealth to rebut Dr. Mack's assessment. He disagreed with Mack's opinion that Eichinger was brain damaged and opined that his cognitive functioning is strong; he is in the 82nd percentile for intelligence; he has a strong processing speed, which strongly indicated against brain damage; he has superior memory functioning at the 87th percentile and tested as high average or superior on tests of executive functioning. (N.T. 1/26/12 at 74-76.) Dr. Sacchetti did not agree that testing showed the presence of a seizure disorder, asserting that Dr. Mack's conclusions from his testing were flawed, and there was no documentation or anecdotal evidence of seizure. (Id. at 77-79.) He stated that test results were not consistent with brain dysfunction from Lyme disease since Lyme disease affects memory, and Eichinger's memory was relatively intact and higher than would be predicted from his IQ score. (Id. at 79.) Sacchetti disagreed with Mack's opinion that Eichinger's deficits implicated his ability to control his emotions since the test results indicated no problem with impulse control. (Id. at 81.) He also disagreed with Dr. Mack's conclusion about Eichinger's judgment and reasoning, and his abilities in understanding and making appropriate responses to social cues, as not supported by testing data. (Id. at 82-83.) Finally, Sacchetti disagreed with Dr. Gur's opinion

that neuropsychological deficits affected Eichinger's ability to plan, monitor and adjust behavior to context since Petitioner scored well on testing. (Id. at 83-84.)

Having reviewed this evidence, the PCRA Court found as fact that Eichinger did not have cognitive limitations or other mental health issues at the time of the murders or at the time of trial. Given the disputed nature of the expert conclusions, we find that Eichinger cannot meet his burden to show the state court findings of fact are clearly erroneous. Based upon those facts, the state courts concluded that counsel were not ineffective in making their strategic choice to forgo pursuing mental health-based guilt phase defenses because such defenses would have been futile. We find that this conclusion was not an unreasonable application of the Strickland standard. Under the Strickland standard, counsel cannot be held ineffective for failing to raise a claim that is without merit or is futile. See Premo v. Moore, 562 U.S. 115, 124 (2011) (holding that when an omitted defense is futile it "confirms that [counsel's] representation was adequate under Strickland, or at least that it would have been reasonable for the state court to reach that conclusion").

### 4. Counsels' Failure to Suppress Statements

#### a. Voluntary, Knowing, and Intelligent

Eichinger made a series of inculpatory statements to police upon which the Commonwealth based its stipulated guilt phase case. Suppression of these statements was litigated, and the statements were found to be admissible prior to his decision to waive a jury trial and agree to a stipulated guilt phase trial that resulted in his first-degree murder convictions. Eichinger argues that, at the time he made his statements, he was suffering from mental and cognitive impairments that made it impossible for him to comprehend his rights and the consequences of waiving them. He asserts that he did not voluntarily, knowingly, and intelligently waive his Miranda rights, and these statements were admitted in violation of his right to counsel and right to remain silent because

trial counsel were ineffective in failing to (1) investigate and present evidence of his mental deficiencies when arguing to suppress the statements and (2) consult with an expert about Eichinger's mental state at the time that he waived these rights. (Pet. Mem. 78-79.) He bases his arguments on the PCRA testimony of Dr. Jethro Toomer, who opined that "[Eichinger's] many significant cognitive and emotional impairments limited Mr. Eichinger's ability to appreciate the gravity and seriousness of the police interrogations . . . ." (Id. at 80 (quoting A1963 (Feb. 4, 2010 Report of Jethro W. Toomer, Ph.D.)); see also N.T. 10/27/11 at 43-45 (Testimony of Dr. Jethro Toomer) ("I would characterize his thinking as being concrete, erratic, lacking abstraction. All those characterize his thought processes. . . . Abstract reasoning ability clearly is absent with Mr. Eichinger.").

In its decision denying the appeal from the dismissal of Eichinger's PCRA petition, PSC adjudicated this issue holding:

> On direct appeal, we decided the statements in question were voluntary and therefore admissible. Eichinger, [915 A.2d at] 1131-36. In his PCRA petition, appellant alleges counsel was ineffective for failing to contest the statements on mental health grounds. He avers these issues are distinct, and therefore this issue was not previously litigated.
>
> The issues are not distinct. A defendant's mental state, including his mental health, is at the heart of the voluntariness inquiry. See Commonwealth v. DeJesus, 787 A.2d 394, 403 (Pa. 2001) (citation omitted) (test for determining voluntariness of confession and validity of waiver looks to totality of circumstances, including defendant's physical and psychological state). Since we have already decided the voluntariness of appellant's confession, we have also impliedly decided the impact his alleged mental health problems may have had on the voluntariness of his Miranda waiver.
>
> Even if the distinction was valid, the argument lacks merit. As we discussed supra, the record supports the PCRA court's finding appellant suffered from no meaningful mental defect at any time relevant to this case. Therefore, that finding is binding on this Court. If appellant was not suffering from a mental defect, trial counsel could not have been ineffective for failing to contest the admissibility of his confessions on that basis.

(A177.) As just discussed, the PCRA Court's factual findings, incorporated by reference by the PSC, credited the expert testimony offered by the Commonwealth and rejected the expert testimony offered by Eichinger, including the opinions of Dr. Toomer.

The state court fact findings on the mental health evidence and the ultimate finding of fact that Eichinger did not suffer from any mental deficit at the time he made his statements must be deemed presumptively correct unless found to be unreasonable on the record presented. Eichinger argues the PSC's determination was unreasonable because it considered only whether the <u>Miranda</u> waiver was voluntary and not whether, in light of the mental health evidence, it was knowing and intelligent.

Eichinger's argument focuses upon the history of how this issue was determined by the PSC, noting that on direct appeal the Court found only that (1) Petitioner had not been in custody before the <u>Miranda</u> warnings were administered, so that any statements he made before that were admissible, (Pet. Mem. at 89 (citing A13, Eichinger-1 at 1134-35)) and (2) any statements he made after receiving the <u>Miranda</u> warnings were admissible because he voluntarily waived his rights (Pet. Mem. at 89 (citing A15, Eichinger at 1135-36)). He argues that, since direct appeals counsel did not include Eichinger's mental and cognitive impairments in the direct appeal brief, the PSC was unable to adequately assess the totality of the circumstances of his waiver. He argues that on the subsequent PCRA appeal the PSC found that the suppression issue was previously litigated on direct appeal and was therefore not available in PCRA for further consideration. (Pet. Mem. at 89-90 (citing A177, Eichinger-3 at 834)). According to Eichinger, the PSC improperly (1) claimed it had already determined his mental capability to voluntarily waive his rights, even though this evidence had not been before the court on direct appeal, while (2) also acknowledging that, even if the mental health evidence developed during the post-conviction investigation created a distinct

new argument, Eichinger's mental impairment was not convincing. (Pet. Mem. at 90 (citing A177, Eichinger-3 at 834)). We reject this argument.

First, as noted, Eichinger argues that this finding is unreasonable because the PSC never considered whether his confession was knowing and intelligent, asserting that it only found the confession was voluntary. (Pet. Mem. at 90.) The assertion that the PSC only determined the voluntariness element is incorrect. Rather, the Court held that

> It is the Commonwealth's burden to establish whether Eichinger knowingly and voluntarily waived his Miranda rights. . . . The Commonwealth has met this burden. . . . The record demonstrates that Eichinger received the proper warnings and that his waiver was **knowing, intelligent and voluntary**.

(A15 (emphasis added).)

Second, Eichinger's assertion that the PSC's finding on appeal from the PCRA Court's decision is unreasonable because it overlooked the "impossibility of evaluating evidence that had not previously been before the court," (Pet. Mem. at 91) is also meritless. The argument ignores the PSC's specific alternative finding in the PCRA appeal decision that

> the record supports the PCRA court's finding appellant suffered from no meaningful mental defect at any time relevant to this case. . . . If appellant was not suffering from a mental defect, trial counsel could not have been ineffective for failing to contest the admissibility of his confessions on that basis.

(A177.) Because the record of mental health evidence was before the PCRA Court, there was no "impossibility of evaluating evidence that had not previously been before the [PSC]."

### b. "In Custody"

Eichinger next asserts that the PSC was unreasonable in finding (1) that he was not "in custody" when he first admitted guilt and (2) that his first admission did not taint his subsequent confessions.

In Miranda, the Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). "'[C]ustody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 565 U.S. 499, 508-09 (2012). In determining whether such a danger is present, the court must examine all the circumstances and ask "'would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" Yarborough v. Alvarado, 541 U.S. 652, 663 (2004) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). This is an objective, not subjective inquiry. Stansbury v. California, 511 U.S. 318, 323 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."). If those circumstances objectively indicate that "'there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest,'" then the suspect was "in custody." Id.; cf. Howes, 565 U.S. at 507 ("Miranda did not even establish that police questioning of a suspect at the station house is always custodial.").

In Thompson, the Court has held that a state court determination as to whether suspect was "in custody" at time of interrogation for purposes of Miranda is not entitled to statutory presumption of correctness during federal habeas corpus review but is a mixed question of law and fact warranting independent review by federal habeas court. Id., 516 U.S. at 112-13. The Court provided the following rubric for habeas review of an "in custody" determination:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry": "[was] there a 'formal arrest or restraint on freedom of

movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting [Oregon v. Mathiason,] 429 U.S. [492], at 495, 97 S.Ct., at 714 [(1977)]). The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d). The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.

Id. (footnote omitted).[22]

The "distinctly factual" scene was set, and the players' lines were established by the PSC on direct review of Eichinger's convictions. In discussing the suppression issue, the Court found:

the facts are not in dispute as Eichinger stipulated to Detective Nilsen's testimony. The detective, accompanied by Detective Godby, went to the Somers Point Acme Food Market in New Jersey, where Eichinger worked. Eichinger agreed to talk to the detectives in an office on the second floor, where the detectives made it clear to him that he was not under arrest and remained free to leave. Eichinger then made a statement concerning his whereabouts that morning that the detectives knew to be false.

After Eichinger made this statement Detective Nilsen left the room and stood in the hall for a few moments. He then returned and suggested to Eichinger that he had just received information that the police would find DNA in the Greaves' driveway that would link Eichinger to the murders. Eichinger dropped his head, crying, and said, "I did it." In order to clarify, Detective Nilsen asked, "Do you mean that you killed Lisa, Avery and Heather Greaves?" Eichinger said, "Yes."

At this point, Detective Nilsen read him his Miranda rights. Eichinger told Detective Nilsen that he understood his rights and that he was willing to voluntarily

_____

[22] Eichinger cites to a Third Circuit decision, United States v. Willaman, 437 F.3d 354 (3d Cir. 2006), setting forth factors courts should examine to objectively determine whether the circumstances of the interrogation would indicate a person is in custody:

(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

Id. at 359-60. Since these factors are not clearly established by the Supreme Court, they are not binding on habeas review.

waive them.  Eichinger then gave a signed written statement describing the murder of Heather, Lisa and Avery.  As it happened, Detective Nilsen had worked on the Jennifer Still case six years earlier, and the similarity of the murders provoked him to ask Eichinger about Jennifer.  The detective re-advised Eichinger of his <u>Miranda</u> rights and then Eichinger gave a signed statement confessing to her murder.

(A7-8 (footnote omitted).)

Eichinger argues that he was in custody when he made his first admission of guilt based on the following assertions of fact:

- The detectives' failed to excuse Mr. Eichinger after they finished questioning him.

- The police came to Mr. Eichinger's workplace and pulled him aside; he did not request to speak to them of his own volition.

- Although the questioning took place in Mr. Eichinger's workplace, the police isolated him in a small back room with a closed door.

- The initial interrogation had already gone on for more than two hours, and by the time it ended four hours later, it was one o'clock in the morning.

- The officers had visible guns.

- Detective Nilsen falsely confronted Mr. Eichinger with the potential DNA results.

- Detective Nilsen feigned a phone call to receive news of Petitioner's DNA, which was false, constituting a coercive tactic that lends credence to the idea that a person is in custody.

(Pet. Mem. at 93-94.)  The first assertion, that the detectives "failed to excuse" Mr. Eichinger after they finished questioning him, is unsupported by any record citation and is contrary to the facts found by the PSC.  The detectives never testified that they were finished questioning Eichinger.  The second assertion, that the detectives came to Eichinger's workplace and pulled him aside is correct, but the assertion that "he did not request to speak to them of his own volition" is

misleading. It is undisputed that Eichinger agreed to talk with them. The third assertion, that the police "isolated him in a small back room with a closed door" is also incorrect. The testimony was that the room was ten feet by 15 feet and a "typical retail management office." (Docket Entry 104-205 (N.T. 9/15/05) at 17.) The detective also testified that the door was partly opened. (Id. at 18.) The assertion about the length of the interview is also misleading; the interview began at 9:20 p.m.; the detectives commenced taking the written statement, a time at which Eichinger agrees he is not under arrest, at 10:10; at some point thereafter, he admitted his culpability and detectives Mirandized him before reopening the written statement at 11:37. (Id. at 21, 24, 27, 29-33.) The assertion that the detectives were armed is accurate. (Id. at 19-20.) The assertions that the detectives used deceptive conduct is also accurate. (Id. at 28-29.) Detective Nilsen also testified that Eichinger agreed to speak to the detectives, he was free to leave, the door of the room was partly open, and he was seated closest to the door (id. at 18), he was never told he was a suspect (id. at 21), he was not handcuffed (id. at 23), and he was not told to come with the detectives to their police station (id).

We conclude that an objective independent review of the "the ultimate inquiry" of whether Eichinger was formally under arrest or suffered a restraint on his freedom of movement of the degree associated with a formal arrest leads to the conclusion that he was not "in custody" at the time he made his initial confession. As noted, Eichinger stipulated to Detective Nilsen's testimony that he agreed to speak to the detectives, he was free to leave, the door of the room was partly open, he was never told he was a suspect, he was not handcuffed, and he was not told to come with the detectives to their police station. In short, there is no evidence that would lead a reasonable person to believe that his freedom was restrained in any significant way or that he was not at liberty to terminate the interrogation and leave.

Because the state courts correctly determined that Eichinger's initial confession was not the product of a custodial interrogation, his arguments about his subsequent statements being tainted fruit of the illegality of the first one (Pet. Mem. 94-96) are legally immaterial. Accordingly, we conclude that the state courts' adjudication of the Miranda-based Strickland issues was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.

## VII. INEFFECTIVENESS CLAIMS RELATED TO THE PENALTY PHASE

### A. Failure to Investigate, Develop and Present Mitigating Evidence

#### 1. Counsels' Lack of Time and Effort

Eichinger argues that trial counsel offered a "truncated penalty phase defense reflecting his truncated preparation." (Pet. Mem. at 99.) He focuses upon the facts that:

- Attorney McElroy was appointed March 30, 2005, approximately seven months before the penalty phase trial commenced but waited until mid-August to request records on Eichinger's background. (N.T. 7/6/2011 at 25, 29-30, 44.)

- McElroy did not contact his investigator until September 23, 2005, and even then, he sought help only in serving subpoenas for potential guilt phase witnesses and not for investigating the crimes or Eichinger's social history. (N.T. 2/8/11 at 40-41.)

- McElroy waited until September 22, 2005, to arrange for psychiatrist Dr. Kenneth Weiss to visit Eichinger in jail; and a second visit was scheduled October 21, 2005, or eleven days before the sentencing phase commenced. (N.T. 10/24/11 at 42-43.)

- Dr. Weiss did not complete his report until one week before the penalty phase trial, but counsel never considered asking for a continuance. (Id. at 45.)

- After the court appointed Attorney Bauer as co-counsel some three weeks before trial, Mr. McElroy did not ask him to assist in any penalty phase preparations. (N.T. 2/9/11 at 120; N.T. 7/21/11 at 19-20.)

- Lead counsel's billing records reflect a total of 28 hours of preparation for the penalty phase. (N.T. 10/24/11 at 91.)

(Pet. Mem. at 99.)

The PSC did not directly address the issue of counsels' lack of time in its ineffective assistance of counsel discussion. The PCRA Court's decision, which is thus the last reasoned opinion on the issue, found:

McElroy's appointment occurred five days after the crime occurred and over six months prior to trial. In that time, Mr. McElroy meaningfully worked on Appellant's case. It was Mr. McElroy who prepared, presented and argued the Suppression Motion and all other pretrial motions, not Mr. Bauer. According to the Petition for Allowance of Compensation, Mr. McElroy spent 38 hours . . . reviewing discovery. [] He spent 13 hours . . . preparing for suppression. [] Mr. McElroy testified that those hours did not account for additional time he spend sending out subpoenas and reviewing client questionnaires. []

Mr. Bauer was brought in to assist Mr. McElroy on September 30, 2005. [] At the time of Mr. Bauer's appointment, Mr. McElroy's plan was to go to a jury trial in the Still case, which he was completely prepared to litigate on his own. Mr. Bauer wasn't brought on to assist with the Still trial. [] However, in September of 2005, Mr. McElroy informally discussed with Mr. Bauer whether he wanted to assist him in the Greaves-Johnson case, which was a capital case. . . .

Mr. Bauer was initially concerned with the timing of his appointment; however he knew that if he needed more time to prepare he could have come to the court and requested a continuance, which he believed would have likely been granted. [] Mr. Bauer knew that at the time of his appointment the plan was to go to trial on both the guilt/innocence phase and penalty phase, with him litigating the guilt phase. . . . During the 17 days prior to trial, Mr. Bauer reviewed the discovery and reviewed Mr. McElroy's file in order to determine whether he needed to request a continuance or whether he was going to be able to proceed. [] Mr. Bauer testified that had he been appointed earlier in the case, his strategy would have been the same. []

. . . [In] fact Mr. McElroy spent [a] considerable amount of time on the guilt

58

> phase for both the 1999 Still murder and the 2005 Greaves-Johnson murders. Appellant wasn't left without an attorney up until three weeks prior to trial, as Appellant's argument seems to suggest.

(A91-93 (internal record citations omitted).) Eichinger does not address the factual finding that counsel had sufficient time to prepare their case, let alone attempt to rebut that presumptively correct statement with clear and convincing evidence. We find, therefore, that the bald assertion that counsels' preparation was "truncated" cannot support the deficiency prong of <u>Strickland</u>. Also, as we find no other instance of ineffectiveness, we find that counsels' allegedly truncated preparation does not establish the prejudice prong.

### 2. Failure to Follow Up on Information

Eichinger also argues that counsel failed to follow up on background information, which if they had done so, would have established a defense based on his alleged organic brain damage. He notes that both he and his mother, Marie Christine Eichinger, provided names of other people to contact, and his mother told counsel that she drank alcohol during her pregnancy and described Eichinger as a loner. (Pet. Mem. at 102-03.) He asserts that pediatric records that counsel failed to obtain showed he had recurring childhood headaches and Lyme disease and, along with PCRA testimony from his own experts, indicated that these records needed further investigation. (<u>Id.</u> at 103-08.) He asserts that his own prison journals "contained numerous red flags for the mitigation case" based on paranoia and delusional thinking (<u>id.</u> at 108), his post-arrest New Jersey jail records indicated he had a flat affect (<u>id.</u>), his pre-trial Montgomery County Jail records note "acute mental disturbance" and that he was housed in the hospital unit for two weeks (<u>id.</u> at 108-09), his school records showed a "red flag for possible brain dysfunction" in his substandard performance not consistent with his IQ scores and that he flunked out of two colleges (<u>id.</u> at 109), and his work records provided a basis for arguing as mitigation that he would adjust well to prison if given a life

sentence.  (Id.)  Eichinger argues counsel was ineffective for failing to investigate whether he suffered from organic brain disease despite the availability of this evidence.  He notes that Attorney McElroy testified that it never occurred to him to have a neuropsychologist examine him because McElroy "wasn't even aware of their existence at the time in 2005."  (N.T. 6/15/11 at 37; id. at 38 (not aware that any expert could measure brain functioning and cognitive disorders in 2005).  McElroy testified that he did not ask Dr. Weiss to determine if Eichinger had brain dysfunction.  (N.T. 7/6/11 at 121; N.T. 10/25/11 at 151.)  Finally, counsel both testified that they would have presented evidence of Eichinger's brain dysfunction had there been such evidence.[23]  He argues that "[t]he many red flags for brain dysfunction would have led any reasonable lawyer to seek appropriate expert advice and testing concerning brain damage."  (Pet. Mem. at 112.)

Whether Eichinger suffered from a mental disorder was discussed previously in the section on guilt phase defenses.  To reiterate, the PSC addressed the issue of the adequacy of counsels' investigation of mental health issues, holding:

> Before addressing each of appellant's particular claims of error, we note that many of them rely on his assertion he suffers from cognitive impairment, incompetency, and mental illness.  Much of the 22 days of evidentiary hearings on appellant's PCRA petition was dedicated to his mental health.  The PCRA court listened to mental health experts from both sides and found none of appellant's evidence compelling.  PCRA Court Opinion, 7/25/12, at 2-3.  It further found appellant "was competent, did not suffer from any cognitive limitations and . . . was not brain damaged either at the time of the murders or at the time of trial."  Id.  Those findings are consistent with record testimony, and therefore binding on this Court.

---

[23]  See N.T. 7/6/11 at 120 ("Clearly, if he was brain damaged, it would have had more relevance than if he did not have brain damage."); N.T. 7/21/11 at 31 ("I'm sure both Mr. McElroy and I would have wanted the jury to hear that [Eichinger was brain damaged], if there was diagnostic proof of some sort of brain damage."); N.T. 10/24/11 at 59 (trial counsel would have wanted jury to hear that "there was cognitive impairment that John had that affected him not necessarily at the time of the crime but generally in the way he comported himself throughout life.").

(A170 (citing A36-37).)  The evidence of organic brain damage was disputed by the parties.  While Dr. Mack opined that Eichinger suffers from brain damage dysfunction in the left temporal aspect of his brain compared with the right hemisphere, likely caused by a car accident, when a tree limb fell on his head, or Lyme disease (N.T. 3/16/11 at 41-42, 47-54, 75-79), Mack's opinion was impeached on cross examination (id. at 90, 143-46.)  Dr. Gur believed the damage was the result of Lyme disease but conceded on cross examination that behavioral imaging methodology is primarily a research tool and not a clinical one.  (N.T. 11/30/11 at 82-83, 89, 91.)  Commonwealth witness Dr. Sacchetti disagreed with Mack's opinion that Eichinger was brain damaged and opined that his cognitive functioning was strong; Eichinger was in the 82nd percentile for intelligence, has a strong processing speed, which strongly indicated against brain damage, has superior memory functioning at the 87th percentile, and tested as high average or superior on tests of executive functioning.  (N.T. 1/26/12 at 74-76.)  Sacchetti did not agree that testing showed the presence of a seizure disorder, and there was no documentation or anecdotal evidence of seizure.  (Id. at 77-79.)  Sacchetti disagreed with Mack's opinion that Eichinger's deficits implicated his ability to control his emotions since the test results indicated no problem with impulse control and he also disagreed with Mack's conclusion about Eichinger's judgment and reasoning and about his ability in understanding and making appropriate response to social cues as not supported by testing data.  (Id. at 81-83.)  Finally, Dr. Sacchetti disagreed with Dr. Gur's opinion that neuropsychological deficits affected Petitioner's ability to plan, monitor and adjust behavior to context since Petitioner scored well on testing.  (Id. at 83-84.)

Having reviewed this evidence, the PCRA Court found as fact that Eichinger did not have cognitive limitations or other mental health issues at the times of the murders or at the time of trial.  Consistent with our conclusion on the guilt phase issues, given the disputed nature of the expert

conclusions Eichinger cannot meet his burden to show the state court findings of fact are clearly erroneous. Based upon those facts, he cannot show that counsel was deficient due to the failure to follow up on available mental health evidence or that he suffered prejudice as a result. Accordingly, the state court decision was not an unreasonable application of either prong of Strickland.

### 3. Failure to Establish Mitigator of Adjustment to Prison Life

Third, Eichinger asserts that counsel were ineffective in failing to develop evidence that he would have adjusted favorably and peaceably to life in prison, presenting only cursory evidence that he committed no infractions during his pretrial confinement, and failing to consult experts in order to marshal evidence that Eichinger would successfully adjust. (Pet. Mem. at 113.) He cites the testimony of various mental health experts and witnesses who testified before the PCRA Court, including Dr. Weiss, Dr. Blair, Dr. Toomer, Dr. Mark Cunningham (whom, as discussed in detail later, the PCRA Court did not permit Eichinger to recall as a witness after he had rested his PCRA case to present further testimony in rebuttal of Commonwealth witness Dr. O'Brien), Donald Houck (Petitioner's manager at the Acme market), Richard McCormick (Petitioner's scoutmaster), Thomas Sposito (Petitioner's assistant scoutmaster), Larry McKenna (Petitioner's school teacher), and Petitioner's mother. He argues that these witnesses could have offered testimony that he could have conformed his behavior to prison life (Weiss, Blair, Toomer), would be a low risk prisoner (Cunningham), was good with repetition and structure (Houck), or was good at following rules (McCormick, Sposito, McKenna, Mrs. Eichinger). (Pet. Mem. at 115-123.)

The PSC rejected this argument on both the deficiency and prejudice prongs of Pennsylvania's equivalent of the Strickland test. Discussing deficiency, the Court stated:

> Appellant argues he was denied effective assistance because trial counsel
> failed to adequately investigate, develop, and present evidence of mitigating factors

that may have outweighed the aggravating circumstances of his crime, sparing him the death penalty.  Specifically, appellant argues proper representation would have proven the existence of three mitigating circumstances:  (1) his lack of capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired; (2) his extreme emotional disturbance at the time of the crime; and (3) the catch-all mitigator.  Appellant argues trial counsel's representation at sentencing fell below professional norms because they failed to: (1) hire a mitigation specialist; (2) retain certain psychological experts; (3) obtain standard social history records, including educational and medical records, and thus failed to provide those to the mental health experts; (4) follow up on available leads; and (5) interview available lay witnesses.

. . .

Trial counsel conducted a reasonable investigation and put on a reasonable mitigation defense during the penalty phase.  Their investigation included compiling a social history from appellant and his family, interviewing numerous potential lay witnesses, and reviewing hundreds of pages of medical, school, counseling, and employment records.  They also retained two mental-health experts to examine appellant.  From that investigation, trial counsel estimated they had a reasonable chance of success at proving the three mitigators appellant now asserts. At sentencing, trial counsel presented testimony from numerous lay witnesses and the two experts in support of those three mitigators.  Nevertheless, the jury was only convinced of one mitigator — that appellant was under extreme emotional disturbance at the time of his capital crimes.  There is a possibility, however improbable, trial counsel might have had more success had they paraded a team of psychological experts onto the stand during the penalty phase.  However, reasonableness of an attorney's strategy may not be evaluated with the benefit of hindsight.  All we must determine is whether the course of action chosen by trial counsel had some reasonable basis designed to effectuate the client's best interests; if so, the court will deem counsel effective.

(A199-201.)  In addressing prejudice, the Court stated:

Even if trial counsel's handling of the penalty phase had been objectively unreasonable, it did not prejudice appellant.  Given the overwhelming evidence to the contrary, it is unlikely testimony from any number of expert witnesses would have caused the jury to find appellant did not appreciate the criminality of his conduct or have the capacity to conform his conduct to the law.

Furthermore, even now, with the benefit of hindsight and extensive additional investigation, appellant only musters arguments in support of three mitigators.  With regard to the murder of Avery Johnson, the jury found four aggravating circumstances, two of which were multiple murders and the murder of a child. . . .  Even if trial counsel's performance in this case had been flawless, appellant almost certainly would still have received the death penalty.

(A201 (citation omitted).)

With the exception of a rebuttal report from Dr. Cunningham (see A3187-3235), the PCRA Court considered the evidence Eichinger cites and rejected the argument that counsel were ineffective for failing to present it as mitigation. The Court made the following factual findings on credibility:

> The theory of the penalty phase defense presented through the testimony of Dr. Blair was that Appellant had a schizoid-dependent personality disorder. [] Dr. Blair was questioned on cross-examination about her report wherein she stated, "[Appellant] has poor coping skills and is susceptible to decompensation at time of heightened stress." Dr. Blair opined that Appellant has very poor coping skills, and when he is very, very stressed he will decompensate and will not be able to control his behavior. [] Dr. Blair was then asked whether the inability to control his behavior could result in murdering people. [] Dr. Blair answered, "Absolutely." [] The District Attorney followed up and questioned Dr. Blair as follows, "[a]nd you can't tell this jury what it is we should look for to make sure that he doesn't decompensate and kill someone else, can you? [] Dr. Blair answered "[n]o."

> It is based upon this testimony that PCRA counsel asserts that Mr. McElroy should have presented evidence that Appellant would make a strong adjustment to prison, to counteract the District Attorney's cross-examination. In support of this argument, Appellant presented the testimony of Mr. McElroy who agreed that if there was evidence of good prison adjustment he would have like to have presented that the jury. Also, Dr. Kenneth Weiss testified at the PCRA hearing that if he had been asked at the penalty phase, he would have opined to a reasonable degree of medical certainty that Appellant would be able to adapt well to prison life. [] However, the testimony conflicted with the testimony of Dr. O'Brien.

> Dr. O'Brien submitted a report dated January 28, 2011, after conducting a psychiatric evaluation of Appellant. [] The evaluation included a cognitive capacity screening exam and a mental status exam. [] In preparing his report, Dr. O'Brien also reviewed a large number of documents, including medical records of Appellant's mother, Appellant's [pediatric and adult medical records, school records, employment records] . . ., investigative materials regarding the Still and the Greaves-Johnson murders, the criminal complaint and affidavit of probable cause, various transcripts of proceedings in connection with Appellant's trial and penalty phase proceedings, the trial court's prior opinion and the Pennsylvania Supreme Court's prior opinion in the present case, . . . , Appellant's handwritten journal kept following Appellant [sic] arrest, . . . two Client Background Information form [sic] completed by Appellant and his mother, correctional records from Atlantic County Criminal Justice [F]acility, the Montgomery County Correctional Facility, SCI-Graterford, SCI-Camp Hill and SCI-Greene, medical

records from the University of Pittsburgh Medical Center, pertaining to a PET scan, reports prepared by Dr. Weiss [] Dr. Blair [] Dr. Ruben C. Gur, Ph.D. [] Dr. Jethro Toomer, Ph.D. [] Dr. Jonathan Mack, Psy.D. [] Dr. Robert C. Bransfield, M.D., [and] a letter [] from Donald Bersoff, Ph.D., J.D. [].

In his testimony, Dr. O'Brien explained that there was very little documentation prior to the time of the penalty phase trial, other than Appellant having symptoms and difficulty adjusting to prison prior to trial, to make a determination of positive prison adaptability. [] He also opined that using a prospective analysis, trying to predict Appellant's prison adaptability based upon his behavior prior to trial, would be very speculative. [] Dr. O'Brien explained that the only real predictor that has been statistically shown to be reliable in terms of predictions done by mental health officials is prior behavior, and in Appellant's case the murders would be a major component of the prior behavior that one would have to consider in predicting future behavior. [] Dr. O'Brien's testimony cast serious doubt on Appellant's experts' opinions that because Appellant was a reliable worker and a rule follower as demonstrated through various school, employment and other records, Appellant would positively adjust to prison. He stated that those opinions did not consider that Appellant is someone who is susceptible to decompensation under stress, and prison life can be very stressful, and those opinions did not account for Appellant's illegal behavior in murdering four people, all of which need to be considered when rendering an opinion about future adjustment in prison. []

This Court credited Dr. O'Brien's testimony. [] Therefore, even if Mr. McElroy's investigation into Appellant's prison adjustment was unreasonable, it did not prejudice Appellant because this Court found that Appellant failed to establish that he could have positively adjusted to prison life.

(A140-43 (citations to the record omitted; some passages edited for readability).)

Preliminarily, we must consider whether the PCRA Court's failure to permit Eichinger to present rebuttal evidence from Dr. Cunningham either permits or requires that this Court grant an evidentiary hearing as Eichinger has requested.[24] "Prior to AEDPA, new evidentiary hearings [in

---

[24] As discussed earlier, Dr. O'Brien opined before the PCRA Court that the only predictor of peaceable adaptation to a prison environment statistically shown to be reliable by mental health officials is prior behavior. He added that murders would be a major component of prior behavior that would have to be considered in predicting Petitioner's future behavior. (NT 1/25/12 at 116-17.) The Commonwealth called Dr. O'Brien to offer PCRA opinion testimony to rebut Eichinger's evidence and arguments that trial counsel were ineffective in failing to prevent his own expert Dr. Blair from offering an opinion on cross examination by the Commonwealth that she could not predict whether Eichinger would kill again in prison. (See Footnote 26 and accompanying text.)

habeas cases] were **required** in several circumstances." Campbell v. Vaughn, 209 F.3d 280, 286

(3d Cir. 2000) (emphasis in original) (citing Townsend v. Sain, 372 U.S. 293, 313 (1963)).

However, where AEDPA applies and where a state court has determined a claim on its merits, the

United States Supreme Court has held that a federal court's reasonableness review of that ruling

under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the

claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The Court explained that

"evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." Id. at 184. Several

circuit courts have concluded that, under Pinholster, district courts should determine whether a

petitioner's claims survive the § 2254(d)(1) standard on the basis of the state record alone, without

reliance on evidence developed in federal evidentiary hearings. See, e.g., Brown v. Wenerowicz,

663 F.3d 619, 629 (3d Cir. 2011); Price v. Thurmer, 637 F.3d 831, 837 (7th Cir. 2011); Jackson v.

Kelly, 650 F.3d 477, 485 (4th Cir. 2011) ("In light of [Pinholster]'s admonition that our review is

limited 'to the record that was before the state court that adjudicated the claim on the merits,' 131

S.Ct. at 1398, we avoid discussion of the evidence taken in the federal evidentiary hearing."); but

see Brown, 663 F.3d at 629 n.4 (3d Cir. 2011) (noting that under Pinholster, where claims are **not**

adjudicated on their merits in state courts "our jurisprudence applying § 2254(e)(2) remains

applicable"); Garner v. Lee, 908 F.3d 845, 860 (2d Cir. 2018) ("Pinholster does not bar a federal

habeas court from holding an evidentiary hearing and considering evidence beyond the state court

record when it engages in this non-§ 2254(d), *de novo* review."). Thus, the first question we must

---

Dr. Cunningham was offered as a rebuttal witness on this discrete issue. (See A3187, 3/16/12
Decl. of Mark D. Cunningham, Ph.D., ABPP (stating that current counsel "requested that I provide
expert consultation regarding testimony that could have been offered at Mr. Eichinger's capital
sentencing phase in November 2005, with particular focus on violence risk assessment for prison
(i.e., the likelihood that Mr. Eichinger would perpetrate serious violence while confined in the
Pennsylvania Department of Corrections on a life without parole sentence.")).)

address is whether the state courts reached an "on the merits" determination of whether counsel was constitutionally ineffective for failing to establish the adjustment to prison life mitigator. If they did, our review is governed by § 2254(d) and we ask only whether the adjudication was contrary to or an unreasonable application of federal law based on the record established in the state courts. It is only if we determine that the state court adjudication fails to pass AEDPA review, or if the claim relies on a factual predicate that could not have previously been discovered through the exercise of due diligence, see 28 U.S.C. § 2254(e)(2)(A)(ii), that we may consider reopening the record.

We find that the state courts clearly adjudicated this claim on its merits. As recounted above, the PSC rejected the adjustment-to-prison-life-ineffective-assistance-of-counsel-claim on both the deficiency and prejudice prongs of Pennsylvania's equivalent of the Strickland test based on the evidentiary record established in the PCRA Court. Accordingly, we must engage in a § 2254(d) review of that merits decision and, in doing so, are "limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181.[25]

---

[25] The fact that the PCRA Court refused to reopen the record to hear Dr. Cunningham's rebuttal evidence does not change the conclusion that the state courts made an "on the merits" decision or mean that Eichinger may have an evidentiary hearing in federal court as part of an AEDPA review. While Eichinger argues that he may present the Cunningham evidence in federal court because the PCRA Court denied him a full and fair opportunity to present his evidence, this ignores the fact that he argued to the PSC that he was denied a full and fair PCRA hearing, the issue was deemed waived by the PSC because it was not specified in his Rule 1925(b) statement — an independent and adequate state ground, see Buck v. Colleran, 115 F. App'x 526, 528 (3d Cir. 2004) — and Eichinger omitted the issue from his federal petition. (See Footnote 5.) We fail to see how he can rely upon an issue that was waived in state court and not even included in his federal petition to overcome the Pinholster holding and have the Cunningham evidence included in our AEDPA review.

To the extent that Eichinger argues the Cunningham evidence is admissible under Section 2254(e)(2)(A)(ii), we note that the PCRA Court determined that the statistical and research-based testimony Eichinger wished to present by way of the Cunningham rebuttal evidence was cumulative of the evidence that had already been presented in Eichinger's case in chief. (A160.) The PCRA Court also rejected Eichinger's claim of surprise from the O'Brien testimony on prison

On AEDPA review of that merits determination, we find that the state courts' conclusions that counsel were not ineffective for failing to present mitigation evidence is not an unreasonable application of <u>Strickland</u>. The various expert and lay testimony Eichinger cites as supporting a never-offered-at-trial "adjustment to prison life" mitigation theory — based upon evidence of rule following and good adaptation to structure — was found not credible by the state courts because the experts failed to consider significant evidence, namely that Eichinger committed his crimes during periods of great stress and prison environments are very stressful. This presumptively correct determination has not been rebutted by clear and convincing evidence in the state court record.

Dr. O'Brien considered the medical, school, employment, penological, and social records Eichinger relies upon, as well as the opinions of Petitioner's experts, and offered a reasoned analysis why that evidence was not credible. The state courts' decision to credit Dr. O'Brien's opinion and reject the opinions of Eichinger's experts is supported by the record, and we are not free to find those factual findings unreasonable merely because we disagree with them or would have reached a different conclusion in the first place. <u>Wood</u>, 558 U.S. at 301. Granting the state courts the substantial deference they are due, we must accept their conclusion that the evidence supporting the never-offered mitigation theory would not have changed the outcome of the penalty phase had counsel so offered it. Accordingly, we conclude that the state courts' determination that

_____

adaptability since that evidence was responding to Eichinger's own experts. (<u>Id.</u>) Accordingly, we fail to see how the evidence would constitute a "factual predicate that could not have been previously discovered through the exercise of due diligence."

We note also that the Supreme Court has clearly established that the question of whether to reopen a record to admit additional evidence is a matter for the sound discretion of the trial court. <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 331 (1971). As the PCRA Court provided a reasoned rationale for its decision, we fail to see how it abused its discretion when it refuse to reopen the record. Finally, as we find *infra* that the adjudication does survive AEDPA review, there is no basis for an evidentiary hearing in federal court.

Eichinger also failed to show the prejudice prong of an ineffective assistance of counsel claim is not unreasonable.

We also conclude that Eichinger cannot show that the state courts' adjudication of the deficiency prong was improper. At the penalty hearing, counsel put on evidence to support three mitigating circumstances: (1) Eichinger was "under the influence of extreme mental or emotional disturbance"; (2) his capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired"; and (3) the catch-all mitigator of any other evidence "concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Cons. Stat. § 9711(e)(2), (e)(3), and (e)(8). Prior counsel retained two experts for the penalty hearing. Having obtained the opinion of two experts, counsel were not obligated to seek out additional experts in the hope that they would provide more favorable opinions. As the PSC stated, "[t]here is a possibility, however improbable, trial counsel might have had more success had they paraded a team of psychological experts onto the stand during the penalty phase. However, reasonableness of an attorney's strategy may not be evaluated with the benefit of hindsight." (A200-01.) This conclusion — that counsel could reasonably rely upon the mental health evaluations they had previously received — cannot, we find, be deemed an unreasonable application of the deficiency prong given that the mitigation case actually presented by Attorneys Bauer and McElroy was partly successful. The jury found that Eichinger was under an extreme mental or emotional disturbance at the time of the 2005 murders. That this partial success did not result in a different verdict in the penalty phase was not a result of counsels' deficiency but rather due to the horrifying aggravating evidence, which included multiple murders, the murder of a three-year-old girl, the motive of eliminating witnesses, and the jury's apparent rejection of Eichinger's claim of remorse. Viewing his claim in light of trial counsels' actual

performance at the penalty hearing, we conclude the state courts did not unreasonably apply the deficiency prong since counsel were acting within "the wide range of reasonable professional assistance."

## VIII. PROSECUTORIAL MISCONDUCT BASED ON FUTURE DANGEROUSNESS ARGUMENT AND DERIVATIVE INEFFECTIVENESS CLAIMS

Petitioner also asserts that the prosecutor engaged in misconduct by raising the prospect of Petitioner's future dangerousness, and trial counsel never raised an objection. He asserts that "trial counsel stood idly by while the Commonwealth deliberately turned Petitioner's positive prison behavior into a highly aggravating, impermissible, and non-statutory argument for death based on the unsupported surmise that Petitioner would kill again in prison if sentenced to life." (Pet. Mem. at 141.) This claim arises from the cross-examination of defense expert Dr. Gillian Blair who, when asked whether or not Eichinger posed a general risk of losing control under stress and killing again in the future, testified that he could.[26] Petitioner argues that "[g]iven the actual evidence of

---

[26] The prosecutor asked Dr. Blair on cross-examination:

Q.    On the last page of your report there is a sentence which reads, "He has poor coping skills and is susceptible to decompensation at times of heightened stress." In other words, when he's under stressful situations, bad stuff might happen.

A.    Right.

Q.    Including killing people, right?

A.    Well, certainly he has very poor coping skills, and when he is very, very stressed he will decompensate and will not be able to control his behavior.

Q.    Which might result in murdering people, right?

A.    Absolutely.

Q.    And you can't tell this jury what it is we should look for to make sure that

his ability to adjust well to a prison environment — with which Dr. Blair agrees and as to which she would have testified if asked — reasonable trial counsel would have ensured that Dr. Blair's testimony on this issue supported the positive prison adjustment [] mitigating circumstance. . . ." (Pet. Mem. at 141.)  He further argues that the prosecutor used this response to, without objection from trial counsel, "support the prosecutor's fear-mongering closing argument to the jury that Petitioner could kill a prison nurse, guard, or fellow prisoner if sentenced to life."[27]  (Pet. Mem. at141.)

Eichinger argues that the prosecutor's comment on his alleged future dangerousness was improper because, under Pennsylvania law, "future dangerousness is not a statutory aggravating factor," see 42 Pa. Cons. Stat. § 9711(d), and "'future dangerousness . . . is not a valid factor to be considered by the jury.'"  (Pet. Mem. at 142 (quoting Commonwealth v. Marrero, 687 A.2d 1102, 1108 n.19 (Pa. 1996).)  He argues that the failure of counsel to object to the cross-examination and the comment during the closing constituted ineffective assistance since counsel failed to

---

he doesn't decompensate and kill someone else, can you?

A.    No.

(Docket Entry 104-174 (N.T. 11/2/05) at 83.)

[27]    The prosecutor made the following comment:

Do you remember when I cross-examined Dr. Gillian [sic].  She said that when the defendant is under stress, he might tend to decompensate.  And I said, [t]hat means when something bad happens in his life, he might kill people, right?  And she said yes.  And I said, [y]ou can't tell us what to look for so that we'll know when he is about to kill somebody in the future.  You're right I can't.

How many more people must die at this man's hands?  Is it going to be a nurse [in] prison? A doctor?  An inmate?  A guard?  A visitor?  How many more people must die at this man's hands?

(Docket Entry 104-221 (N.T. 11/3/05) at 24-25.)

understand the relevant law and failed to present readily available evidence — described previously and rejected as an independent ground for ineffective assistance of counsel — that Eichinger would adjust well to prison. (Pet. Mem. at 145-46.) He concludes that, because of counsels' deficient performance, "the Commonwealth was able to mislead the sentencing jury to believe that Petitioner would kill more people in prison if he was not given a death sentence." (Pet. Mem. at 146.)

With regard to his argument that counsel "failed to understand the relevant law," while Eichinger is correct that future dangerousness is not one of the statutory aggravating factors, his assertion that future dangerousness "is not a valid factor to be considered by the jury" misstates the cited state court precedent and clearly established federal law. In Marrero, the issue was whether a defendant should have been permitted to explore potential jurors' possible racial bias during *voir dire*. Id. at 1107-08. The Pennsylvania Court noted that a majority of the United States Supreme Court had held in Turner v. Murray, 476 U.S. 28 (1986) that where the defendant has been charged with a capital crime and the defendant and the victim were of different races "such a situation amounts to special circumstances allowing the defendant to question the jury regarding possible racial bias." Marrero, 687 A.2d at 1108 n.19. The Marrero Court went on to note that the Virginia death penalty statute at issue in Turner required a jury to find either that the defendant was likely to commit future violent crimes or that the crime itself was "outrageously or wantonly vile, horrible or inhumane in that it involved torture, depravity of mind or an aggravated battery to the victim." Id. (quoting Turner, 476 U.S. at 34 (citing Va. Code § 19.2–264.2 (1983)). To distinguish the holding of Turner, the PSC noted also that,

> In Pennsylvania, however, future dangerousness is not an aggravating circumstance under Pennsylvania's death penalty statute, *and therefore is not a valid factor to be considered by the jury*. [] Because the aggravating factors in Pennsylvania all relate to either specific past crimes of the defendant or to the specific circumstances

of the crime for which sentence is being imposed, Pennsylvania capital juries do not have the unfettered discretion with which the United States Supreme Court was concerned.

Id. (emphasis added).

Eight years after the United States Supreme Court decision in Turner, that Court decided Simmons v. South Carolina, 512 U.S. 154 (1994). In Simmons, a plurality of the Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Id. at 156; see also Robinson v. Beard, 762 F.3d 316, 327 (3d Cir. 2014) ("The fundamental takeaway from Simmons is that a jury cannot be presented with generalized arguments regarding the defendant's future dangerousness while also being prevented from learning that the defendant will never be released on parole.") Thereafter, the PSC held that under Simmons "a jury must be informed that life means life without the possibility of parole *only* when the prosecutor injects concerns of the defendant's future dangerousness into the case." Commonwealth v. Speight, 677 A.2d 317, 326 (Pa. 1996) (emphasis added) (concluding the prosecutor had not made appellant's future dangerousness an issue, and the instruction would not have been required under Simmons).

The United States Supreme Court again addressed the issue in Kelly v. South Carolina, 534 U.S. 246 (2002) holding that introducing evidence that only bore "a tendency" to prove dangerousness in the future raised the specter of a defendant's "future dangerousness." Id. at 254 ("Evidence of future dangerousness under Simmons is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms.").

Any reliance by Eichinger on the <u>Marrero</u> footnote to support an argument that future dangerousness may *never* be considered under Pennsylvania law is incorrect. While future dangerousness is not an aggravating factor, where the Commonwealth can prove aggravating factors, Pennsylvania cases make clear that future dangerous may be considered so long as a jury is instructed that a life sentence means life without the possibility of parole. <u>See e.g.</u> <u>Commonwealth v. Mason</u>, 130 A.3d 601, 650 n.54 (Pa. 2015). More importantly, the United States Supreme Court has never held that such evidence is inadmissible. Here it is undisputed that trial counsel requested a "life means life" instruction, and the trial court instructed the jury as requested. (A134, 314-15, 3284, Docket Entry 104-163 (N.T. 11/1/05) at 16.) Accordingly, Eichinger's argument that counsel were ineffective because they "failed to understand the relevant law" is meritless.

We also find that the PSC did not unreasonably apply clearly established federal law when it held that it is not error for a prosecutor to argue future dangerousness. First recognizing that future dangerousness is not an enumerated statutory aggravating factor, "and unlike the statutory aggravating circumstances, it may not be used by a jury as the sole reason for imposing a death sentence," (A179 (citing <u>Marrero</u>, 687 A.2d at 1108 n.19)), the Court went on to hold

> While "[i]t is not *per se* error for a prosecutor to argue a defendant's future dangerousness," <u>Commonwealth v. Smith</u>, 606 Pa. 127, 995 A.2d 1143, 1163 (2010), where future dangerousness is at issue and a capital defendant requests a specific instruction that his first degree murder conviction precludes his eligibility for parole, it is a denial of due process to refuse that instruction, <u>see</u> <u>Commonwealth v. Chambers</u>, 546 Pa. 370, 685 A.2d 96, 106 (1996). Thus, a prosecutor is permitted to discuss a defendant's future dangerousness during rebuttal, after a defendant places his future conduct at issue.

(A179.) Finding that Eichinger had injected his future dangerousness into the penalty phase by introducing the testimony of a correctional counselor, who stated Petitioner conformed to the correctional facility's regulations, the PSC held that "[t]his testimony opened the door for the

prosecution to explore [Eichinger]'s conformance and was therefore a 'fair response' to [Eichinger]'s argument regarding his status as a model prisoner." (A179-80.) Because Eichinger opened the door by raising his future peaceability and ability to conform to prison regulations, the state courts did not unreasonable apply federal law in concluding that the prosecutor was permitted to rebut the assertion and address the evidence during his closing argument to the penalty phase jury. Because the evidence was properly admissible, and counsel asked for and received the "life-means-life" jury instruction, the state court's finding counsel could not be deemed to be ineffective for failing to raise a meritless objection was not an unreasonable application of Strickland.[28]

## IX.   INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO ADEQUATELY CROSS-EXAMINE THE COMMONWEALTH'S MENTAL HEALTH EXPERT

Eichinger asserts that trial counsel were ineffective in their cross-examination of the Commonwealth's mental health expert Dr. Timothy Michals. He argues Michals' testimony — that Petitioner did not suffer from a personality disorder or any other mitigating diagnosis — was

---

[28] We note that Eichinger also argues that trial counsel acted deficiently "in first choosing to present Dr. Blair's testimony and in allowing her to provide the only support for the Commonwealth's inflammatory future dangerousness argument." (Pet. Mem. 146.) This argument appears to have never been raised before the state courts. (See A2917 (Am. PCRA Pet.) (arguing ineffective assistance for failing to object prosecutorial misconduct for asserting future dangerousness without mentioning ineffectiveness based on presenting the Blair testimony). It is, accordingly, an unexhausted claim that is procedurally defaulted. Given the state courts' findings on the primary issue, we find that the default may not be excused on cause and prejudice grounds. We also cannot excuse the default on miscarriage of justice grounds since there is no hint in the record that Eichinger is actually innocent.

In addition, in the guise of asserting that the state courts unreasonably determined the facts, Petitioner repeats the same arguments about presenting Dr. Blair's testimony in asserting that the state courts "overlooked trial counsel's ineffectiveness in 'opening the door' to the prosecution's future dangerousness argument." (Pet. Mem. at 155.) The reason the state courts may have "overlooked" the argument is that this too was never raised as an independent ineffective assistance of counsel claim in the state courts. Because it was never raised, we may not conduct a *de novo* review, as Petitioner asserts. (Pet. Mem. 156-57.)

reached without his ever examining Eichinger in person, despite Michals' own view, expressed in another case, that "it is not proper to render opinions about the psychiatric state of a criminal defendant without first having conducted a personal evaluation." (Pet. Mem. at 157 (quoting Commonwealth v. Robert Zook, Court of Common Pleas, Lancaster County, No. 1700-1985, N.T. 2/3/04 at 159).) While he concedes that trial counsel "elicited the fact that Dr. Michals never examined Petitioner" (id. (quoting N.T. 11/2/05 at 175-76)), he argues that counsel "did not investigate or present evidence that Dr. Michals' examination-free findings violated the standards of his profession as well as his own practices." (Id.) He also asserts that counsel were ineffective because they did not decide which of them would conduct the cross-examination before Michals began to testify and because they failed to impeach him on the ground that offering a psychiatric opinion without examining a patient violated the accepted practices of Dr. Michals' field. (Id. at 157-58.)

In deciding this ineffectiveness claim, the PSC adjudicated the merits of the claim[29] holding:

> Appellant argues Dr. Michals was bound by the rules of the psychiatric profession before testifying regarding appellant's mental health. This argument fails on numerous levels. First, appellant cites no authority; he does not cite the ethics rule of the psychiatric profession Dr. Michals supposedly violated, and he cites no legal authority for the proposition that such a violation renders his testimony inadmissible. The reason appellant is unable to provide citation in support of his argument is because none exists. An extensive search of authority from all United States jurisdictions reveals none in support of the proposition a violation of the ethics rules for an expert witness's profession is objectionable. This Court is no

---

[29] Eichinger asked for an evidentiary hearing on this claim to question trial counsel on their reasons for not objecting to Dr. Michals' testimony. (See N.T. 10/24/18 at 11:14-20.) Because the state courts adjudicated the claim on the merits we conduct an AEDPA review of whether that adjudication was contrary to or an unreasonable application of federal law. Pinholster, therefore, requires that we review the claim based on the record before the state courts. Because there is no claim that the factual predicate could not have been discovered during the PCRA process through the exercise of due diligence, and we determine *infra* that the adjudication survives AEDPA review, there is no basis for an evidentiary hearing on the claim.

> authority on the ethical constraints of the psychiatric profession, so we cannot
> comment on Dr. Michals's supposed ethical violation. However, assuming such a
> violation did occur, it has no bearing on the admissibility of Dr. Michals['] 
> testimony. That Dr. Michals had never personally examined appellant is a fact that
> may have legitimately degraded the weight of his testimony. Trial counsel
> recognized as much and cross-examined him on it. N.T. Sentencing, 11/2/05, at
> 175-76. In doing so, they satisfied their obligation to challenge his testimony.

(A185-86.) Notably, Eichinger does not cite any authority in his federal petition either that would indicate that a violation of the standards of psychiatric profession occurs when a psychiatrist offers an opinion without examining the subject of that opinion.

We find that the state courts' conclusion is not an unreasonable application of the Strickland standard. Given that Eichinger cited no authority to show Dr. Michals violated an ethical standard, cited no authority that such a violation could render testimony inadmissible, and conceded that counsel attempted to impeach the weight the jury should assign to Michals' opinion by cross-examining him on the fact that he never personally examined Eichinger, it is hard to see how counsel were deficient or how the state courts acted unreasonably in finding that no deficiency had been proven. Coupled with the presumptively correct fact, as found by the PCRA Court, that Eichinger suffered no relevant mental health issues, he cannot establish that trial counsels' alleged failure worked to his prejudice.

## X.  FAILURE TO OBJECT TO THE PROSECUTOR'S PENALTY PHASE CLOSING ARGUMENT

Eichinger next argues that five comments made by the prosecutor in his closing argument to the penalty phase jury were improper and that counsel was ineffective for failing to object thereto. Specifically, he contends that certain of the prosecutor's comments (1) shifted the burden of proof to the defense; (2) wrongly claimed that no mitigation evidence was presented; (3)

improperly emphasized his role as the representative of the Commonwealth; (4) argued non-statutory aggravators; and (5) advanced an improper "no mercy" argument.

When considering whether a prosecutor made improper comments, the relevant question is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). The totality of the circumstances and the prosecutor's entire argument must be considered in making this determination. See Donnelly at 643 ("We do not believe that examination of the entire proceedings in this case supports that contention."); id. at 646 ("the prosecutor's remark here, admittedly an ambiguous one, was but one moment in an extended trial and was followed by specific disapproving instructions. Although the process of constitutional line drawing in this regard is necessarily imprecise, we simply do not believe that this incident made respondent's trial so fundamentally unfair as to deny him due process."); see also Berger v. United States, 295 U.S. 78, 85 (1935) ("A reading of the entire argument is necessary to an appreciation of [the] objectionable features.").

## A.      Shifting the Burden of Proof to the Defense

The first comment Eichinger condemns is when the prosecutor argued:

> This is a situation when *the law warrants, requires and compels you to do your duty, to vote to impose the death penalty*. If not in this case, when do we do it? When do we do it? If not here, when? What this defendant did is so horrific that it cries out, in one case in the voice of a little girl, it cries out for the death penalty. The time has come, *the law demands that you impose the death sentence*. Now, members of the jury, the defendant, like all other defendants in Pennsylvania, was shielded with all of the rights and protections that citizens have. It is now time that the sword of justice be wielded in this case. . . . It is now time that society takes what society must, *because in this case the death penalty must be imposed. It must be*.

(Pet. Mem. at 171 (quoting N.T. 11/3/05 at 25-26) (emphasis added in Pet. Mem.) He argues that the highlighted portions exerted improper pressure on the jurors to return a death sentence.

While not making a specific determination whether this excerpt was improper in its discussion of the challenged comments, the PSC commented generally that under Pennsylvania law,

> "A prosecutor has great discretion during closing argument; indeed, closing 'argument' is just that: argument." Commonwealth v. Brown, 911 A.2d 576, 580 (Pa. Super. [Ct.] 2006). "[T]he prosecutor must limit his argument to the facts in evidence and legitimate inferences therefrom." Commonwealth v. Gilman, 368 A.2d 253, 257 (Pa. 1977) (citation omitted). However, the prosecutor "must have reasonable latitude in [fairly] presenting [a] case [to the jury,] and must be free [to present] his [or her closing] arguments with logical force and vigor." Commonwealth v. Johnson, 533 A.2d 994, 996 (Pa. 1987) (citation omitted) (internal quotations omitted). Therefore, "[c]omments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in the jurors' minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict." Commonwealth v. Bryant, 67 A.3d 716, 727 [(Pa. 2013)] (internal markings and citations omitted).

(A181.) The PCRA Court did address the specific, alleged burden shifting comment, making its decision the last reasoned opinion on the burden shifting comment issue. That Court began its consideration by stating:

> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. Moreover, the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. If a challenged remark is made in response to the defense's closing argument, it will generally be deemed fair response and hence permissible comment.

(A123 (quoting Commonwealth v. Smith, 995 A.2d 1143, 1162 (Pa. 2010) (citing Commonwealth v. Abu–Jamal, 720 A.2d 79, 110 (Pa. 1998) (citations omitted)).) With regard to the specific comment, that Court held:

Appellant's allegation of prosecutorial misconduct [is] without merit. During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. [] The excerpts cited by Appellant in support of his allegation that the prosecutor shifted the burden of proof, is oratorical flair which is permitted under the law. Additionally, the jury was instructed as to the correct burden of proof under the law, and there is absolutely no evidence to suggest that the jury did not follow this Court's instructions.

(A129-30 (internal citation omitted).)

We conclude that the consideration of this issue was not contrary to the Supreme Court's decisions in <u>Darden</u> and <u>Donnelly</u>. The holding that the prosecutor must limit his argument to the facts in evidence and legitimate inferences therefrom, as well as the admonition that comments are improper where their unavoidable effect is to prejudice the jury, is substantively indistinguishable from the United States Supreme Court's statement that the comments are improper when they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden</u>, 477 U.S. at 181.

Neither was the state courts' conclusion an unreasonable application. The PCRA Court viewed the comment in the totality of the circumstances — including its own charge to the jury on the correct burden of proof as well as the prosecutor's entire argument — and concluded that he did not improperly attempt to shift the burden. Importantly, the comment quoted above by Eichinger, is taken out of context. The "law warrants, requires and compels you to do your duty" comment was prefaced by the following:

I have argued to you, and I suggest the evidence supports there are no mitigating factors in this case and that they are manufactured to try to convince you that there are mitigating factors, but they're [sic] not. *This is a situation when the law warrants, requires and compels you to do your duty, to vote to impose the death penalty.*

(A129 (quoting N.T. 11/3/05 at 25-26) (emphasis added in Petitioner's PCRA petition).) When viewed in context, it is clear that the prosecutor was commenting on the quality of the evidence, not imploring the jury to exact vengeance.

We find further that Eichinger's citation to the Third Circuit decision in Lesko v. Lehman, 925 F.2d 1527 (3d Cir. 1991) to support his assertion that the prosecutor's allegedly vengeful "if not in this case, when" comment crossed the line is unavailing. While we may consider non-Supreme Court decisions, only clearly established Supreme Court law can serve as a basis for overturning the state courts' decision under the contrary to/unreasonable application standard of AEDPA, not circuit law interpreting Supreme Court decisions. See Williams, 529 U.S. at 412 (defining "clearly established Federal law, as determined by the Supreme Court" to mean holdings of Supreme Court decisions); but see Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999) (en banc) ("[W]e do not believe federal habeas courts are precluded from considering decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable."). The comment at issue in Lesko, a case involving two murders but where the Commonwealth only sought the death penalty for the second of the two, was

> We have a death penalty for a reason. Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty.

Id. at 1540-41. The Third Circuit found the comment improper in two respects. First, it was directed to passion and prejudice rather than to an understanding of the facts and of the law and, second, the suggestion that the jury had a duty to even the score invited the jury to impose the death sentence for either of the two murders when only one conviction was death eligible. Id. at 1545. Combined with other statements that constituted an impermissible comment on the

defendant's failure to testify, the Third Circuit concluded that the combined error was not harmless.  Id. at 1546-47.

The Lesko comments are a bad analogy to those at issue here.  While facially similar in that both prosecutors asked the jury "if not here, where" type questions, given the context noted above for the comments about Eichinger, showing that the prosecutor was properly commenting on the quality of the evidence, there can be no similar conclusion that the comment here was an appeal for vengeance.  Because the comment was not improper, the state court's finding that counsel cannot be deemed ineffective for failing to raise an objection was not an unreasonable application of Strickland.

**B.  Wrongly Claiming that No Mitigation Evidence was Presented**

The next challenged comment concerns what Eichinger asserts was an attempt by the prosecutor to argue that no mitigation evidence had been presented.  The prosecutor told the jury:

> [M]embers of the jury, there is no mitigation in this case.  There is no mitigation in this case. . . .  Why is there no mitigation?  Do you know what the defense in this case is?  The defense in this case is summed up by the single line in the fill-in-the-blank test.  The defense is:  "I need a miracle."  And the defense, members of the jury, has tried to manufacture a miracle for the defendant.  That should offend you to your very core.
>
> \*       \*       \*
>
> And all of the psycho-babble you heard from the defense psychiatrists, that ought to a scream at your common sense and say, Hey, wait a minute, that's nonsense.  Can you believe those doctors?  Didn't even read the confession the defendant gave on the day of the murder.  That is astounding.  You heard Dr. Michals say I can't believe they wouldn't do that, because the testimony is designed to convince you that on the day of the crime he suffered from some mental breakdown, the day of the crime.  Well, the police officers are with him the day of the crime.  They write reports and they take statements, and the defense experts didn't even read those statements.  Unbelievable.  Unbelievable.  And that should offend you that they presented that to you as mitigation.
>
> \*       \*       \*

He had no history of mental illness, he had no difficulty at work, he had no difficulty
in graduating from high school and even doing some college. There is no evidence
he ever had manifestations of a mental imbalance. That is all nonsense and you
should consider it as complete and utter nonsense.

\*     \*     \*

Now, members of the jury, I suggest to you that you should wholly, completely and
utterly reject any psychiatric evidence presented by the defense and not find it as
mitigation. And I think you should consider the fact that the defendant
manufactured this in an effort to pull the wool over your eyes, like he tried to fool
the police, like he tried to fool the Court when he lied under oath, and he is trying
to fool you now through his lawyers and the psycho-experts. You should utterly,
completely reject that.

\*     \*     \*

Now, in addition to the psycho-babble the defense asked you to find as mitigation,
the defense is asking you to consider that he is an Eagle Scout and that he managed
to graduate from high school and that his father has a terrible disease, and I don't
know, he loves his dog. I don't know what it is. Everybody, members of the jury,
has things in their lives that they would rather were not there and everybody has
things in their lives that they have done that are achievements. But that is not
mitigation of sentence, members of the jury. That can't possibly be considered a
reasonable thing to mitigate, that tends to make these killings less severe than they
are. I suggest to you that that is the last vestige of the scoundrel. Well, I'm not
such a bad guy because I love my mother and I graduated from high school and I
worked for the Acme. Come on. That is complete and utter nonsense and you
should treat it as such.

\*     \*     \*

I have argued to you, and I suggest the evidence supports there are no mitigating
factors in this case and that they are manufactured to try to convince you that there
are mitigating factors, but they're [sic] not.

(Docket Entry 104-221 (N.T. 11/3/05) at 10-16, 25.)   While conceding that a prosecutor is

permitted to argue that mitigation evidence in insufficiently compelling, Eichinger argues that

these comments were improper because the prosecutor repeatedly stated there were *no* mitigating

factors and that the evidence put forward by the defense did not amount to mitigation. (Pet. Mem.

at 174.)  He argues that the comments ran afoul of Supreme Court precedent mandating that juries

consider all relevant mitigating evidence in capital cases.  See Hitchcock v. Dugger, 481 U.S. 393, 394 (1987) (holding that the Eighth Amendment "requires" the sentencer to consider the particular circumstances of the offender and the offense); Lockett, 438 U.S. at 604 (concluding that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis and footnote omitted)).  Eichinger argues that a "necessary corollary is that a prosecutor may not insist that the jury ignore such evidence."  (Pet. Mem. at 174 (citing Weaver v. Bowersox, 438 F.3d 832, 841 (8th Cir. 2006) (holding it was improper to argue that "quite frankly, if you don't sentence him to die in this case, there's no point in having a death penalty" because it argues that a "signal must be sent from one case to affect other cases puts a [sic] improper burden on the defendant because it prevents an individual determination of the appropriateness of capital punishment."); Rollins v. Horn, C.A. No. 00-1288, 2005 WL 1806504 at *21 (E.D. Pa. July 26, 2005) (citing Hitchcock and stating: "While a prosecutor is entitled to argue that the mitigating evidence presented by the defendant is not compelling, a jury cannot be precluded from considering any relevant mitigating evidence.").  Eichinger argues that since the jury rejected his arguments on the "catch-all" mitigator, see 42 Pa. Cons. Stat. § 9711(e)(8), the prosecutor's arguments successfully persuaded them "that the mitigating evidence did not even exist."  (Pet. Mem. at 175.)

The PSC addressed the merits of this claim as follows:

Appellant argues these comments offend rulings from the United States Supreme Court that any aspect of a defendant's character proffered as a basis for a sentence less than death should be considered as a mitigating factor, see Lockett v. Ohio, 438 U.S. 586, 604 (1978), and that there need not be any nexus between a defendant's mitigation and the crime, see Tennard v. Dretke, 542 U.S. 274, 289 (2004).

84

Appellant grossly mischaracterizes the cited cases. Those cases hold evidence relevant to a defendant's character must be admitted in a capital sentencing if a defendant offers it. In no way do those cases say the jury is required to give it any weight, or that the Commonwealth is not permitted to argue against it or produce contrary evidence. It is well settled "[a] prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor." Chmiel, at 1185. That is precisely what the prosecutor did with the comments about which appellant now complains.

(A184-85.)[30]

We conclude that this holding was not contrary to federal law since the PSC correctly identified the controlling precedent; neither was it an unreasonable application of Hitchcock and Lockett. Nothing in the holdings in Hitchcock and Lockett suggest that a prosecutor is barred from commenting on mitigation evidence to argue to the jury that it should be given little or no weight. What those decisions prohibit is a death sentencing scheme that precludes a jury from *considering*, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

We find that the state courts' conclusion that the prosecutor's comments were appropriately directed to the weight to be accorded to Eichinger's mitigation evidence was also not an unreasonable application. While he used the shorthand "mitigation" rather than "mitigation evidence" when he commented that "there is no mitigation in this case," the context and entirety of the prosecutor's comments clearly refer to the weight the jury should accord to the mitigation evidence and not that the jury was barred from considering it. Referring to evidence as "psycho-babble" that the jury should consider "in their common sense" to be "nonsense" necessarily implies

---

[30] The PCRA Court similarly held that "Appellant argues that it was improper for the prosecutor to argue that evidence of his character could not be considered as mitigation. . . . Here, the prosecutor characterized Appellant's mitigating evidence as an 'excuse,' rather than science. . . . A prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor." (A132 (citation to the record omitted).)

that they should consider it and then reject it as not worthy of belief. Indeed, the prosecutor specifically argued that the jury should reject any psychiatric evidence and "not *find* it as mitigation," because the jury "should *consider* the fact that the defendant manufactured" the psychological evidence. Similarly, the prosecutor's arguments concerning the evidence of Eichinger's participation in Boy Scouts and other positive evidence of his character was not that they jury was barred from considering it, but rather that this evidence was "nonsense and you should *treat* it as such." "Finding," "considering" and "treating" evidence are references to the weight the jury should accord to it, not an argument that it could not consider the evidence.

Because the comments were not objectionable, the state courts' determination that counsel was not ineffective for failing to object thereto is also not an unreasonable application of Strickland.

### C. Improperly Emphasizing his Role as the Representative of the Commonwealth

Next, Eichinger argues that the prosecutor improperly emphasized his role as a representative of the Commonwealth when he made the following comment:

> Members of the jury, for twenty years I have stood in courtrooms, this one and others, and asked jurors to do justice between the Commonwealth and someone who committed a foul crime, usually a murder. Every time I do that I am reminded of the awesome responsibility that is given to us by the people to represent them in cases of this sort. I do that and I do it willingly. When I became an Assistant District Attorney and then later as District Attorney, I put my hand on the Bible and swore I would protect the citizens of this country, and it is because I swore those oaths that I stand before you today.

(N.T. 11/3/05 at 7-8.) Eichinger asserts that these statements "were an improper attempt to wrap the prosecutor in the cloak of state authority and implied that he was required by his 'oath' to seek the death penalty." (Pet. Mem. at 175.) He argues that urging the jury to consider his 20 years of experience improperly "insinuated that 'justice' necessitated a vote for the death penalty." (Pet. Mem. at 176 (citing United States v. Costa, 553 F. App'x 227, 232 (3d Cir. 2014) ("Improper

vouching may occur if a prosecutor makes 'repeated comments aimed at establishing his own veracity and credibility as a representative of the government.'") (quoting United States v. Smith, 962 F.2d 923, 933 (9th Cir. 1992)); United States v. DiPasquale, 740 F.2d 1282, 1296 (3d Cir. 1984) ("Time and again, we have emphasized that a prosecutor bears a special responsibility not to abuse the prestige that accrues to his office.")).)

The PSC rejected this argument on the merits stating:

First, appellant takes issue with the prosecutor emphasizing his role as a representative of the state and, claiming the prosecutor expressed his personal belief that seeking death was required by his oath of office. . . . Appellant argues such language wrapped the prosecutor in the cloak of state authority. However, he cites no authority for that proposition and fails to make a logical argument regarding how the comment was unfairly prejudicial. It is even less prejudicial in light of what was said next, which appellant declined to quote:

But, members of the jury, I am not the only one here who took an oath. Each of you actually twice took an oath. Last week you swore that you would answer truthfully the questions that we put to you to determine whether you would be seated in one of those chairs. Do you remember that? Well, you know last week when a judge of the Court of Common Pleas of Montgomery County, in his robe, on the bench, and then the District Attorney of this county asked you if the law required you to impose the death penalty, you all said you would follow the law.

[] Read together, these passages can only be characterized as the prosecutor reminding the jury of his duties and its obligation to sentence appellant according to the law, rather than emotion. Thus, when read in context, there is nothing objectionable about the comment.

(A181-82 (quoting N.T. 11/3/05 at 7-8) (record citation omitted).)

In Berger, the United States Supreme Court stated that a criminal prosecutor has a special obligation to avoid "improper suggestions, insinuations, and, especially, assertions of personal knowledge [which] are apt to carry much weight against the accused when they should properly carry none." Id., 295 U.S. at 88, overruled on other grounds by Stirone v. United States, 361 U.S. 212 (1960); see also United States v. Young, 470 U.S. 1, 18-19 (1985) ("the prosecutor's opinion

carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.").  Such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant, [thus jeopardizing] the defendant's right to be tried solely on the evidence presented to the jury."  Young, 470 U.S. at 18.

We find that the PSC's conclusion was not contrary to federal law as determined in Berger and Young.  While the PSC did not cite those decisions, that is not determinative of the "contrary to" analysis.  Mitchell v. Esparza, 540 U.S. 12, 16 (2003) ("A state court's decision is not contrary to . . . clearly established Federal law simply because the court did not cite our opinions.") (citing Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam)).  Rather, the AEDPA standard is only violated if the state court decision contradicts Supreme Court law.  Notably, Eichinger fails to cite any specific and contradictory Supreme Court cases in making his argument and relies instead on Third and Ninth Circuit cases.

We also find that the PSC's conclusion was not an unreasonable application of Berger and Young.  Rather than attempting to use the imprimatur of his office to improperly sway the jury, the context provided by the additional portions of the prosecutor's comment quoted by the PSC make clear that his comment was directed to reminding the jurors of their own oath, not that he was required by his oath to seek the death penalty or that he improperly insinuated that justice necessitated a vote for the death penalty.

Because the comments were not objectionable, the state courts' determination that counsel was not ineffective for failing to object thereto is also not an unreasonable application of Strickland.

## D.    Arguing Non-Statutory Aggravators

In addition to repeating his argument that the prosecutor's reference to future dangerousness was improper, Eichinger also points to comments that he argues implored the jury to consider maliciousness, wickedness, and evilness as non-statutory aggravating factors:

> Remember I told you in my opening to look at everything in this case through two prisms. Remember? The first that he is a malicious killer; hardness of heart, cruelty, wickedness, and that you should consider everything that is said knowing that as a fact. Make no mistake. There is no chance that an innocent man is seated there. No chance. And there is no chance that we are asking you to sentence an innocent man to death. He is a malicious killer and everything you heard has to be viewed knowing that as a fact.

> \*         \*         \*

> Conscious, malicious, volitional decision to murder her. If I can't have her, no one can. He murdered these people maliciously; in other words, with a stone rock-hard heart, wickedness of disposition, evilness and a complete and utter indifference to the value of human life.

(Pet. Mem. at 177-78 (quoting N.T. 11/3/05 at 15, 26).)  Eichinger argues that these comments were improper because Pennsylvania's death penalty scheme expressly limits consideration of aggravating factors to the sixteen enumerated in 42 Pa. Cons. Stat. § 9711(d), and the statutory list does not include future dangerousness, malice, or premeditation. (Pet. Mem. at 178.) He also argues that

> Consideration of all of this non-statutory aggravating evidence in Petitioner's capital sentencing proceedings thus violated his due process rights. Furthermore, Supreme Court jurisprudence clearly establishes that "in a State where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment." Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). Accord Sochor v. Florida, 504 U.S. 527, 532 (1992); Clemons [v. Mississippi], 494 U.S. [738] at 752 [(1990)].

(Pet. Mem. at 179.)

The PSC addressed this comment by the prosecutor stating:

Appellant's characterization of these comments as urging a finding of non-statutory

> aggravating factors is wholly irrational. "A prosecutor does not engage in misconduct when his statements are based on the evidence or made with oratorical flair." Commonwealth v. Carson, 913 A.2d 220, 237 (Pa. 2006) (citing Commonwealth v. Marshall, 633 A.2d 1100, 1110 (Pa. 1993)). The prosecutor's comments were merely a review of evidence properly admitted into the record and were within permissible characterization of the facts proven by that evidence.

(A183.)

We find that this analysis was not contrary to federal law as determined by the Supreme Court. While Eichinger relies upon the holding in Espinosa v. Florida, that decision must be distinguished. In that case the Supreme Court was faced with a two-step Florida sentencing scheme that first required the penalty phase jury to render a verdict

> "[w]hether sufficient aggravating circumstances exist," "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances," and "[b]ased on these considerations, whether the defendant should be sentenced to life imprisonment or death." [] The verdict does not include specific findings of aggravating and mitigating circumstances, but states only the jury's sentencing recommendation. "Notwithstanding the recommendation of a majority of the jury," the trial court itself must then "weig[h] the aggravating and mitigating circumstances" to determine finally whether the sentence will be life or death.

Id., 505 U.S. at 1080 (alterations in original, statutory citation omitted). Using statutory language, the trial court instructed the jury that it was entitled to find as an aggravating factor that the murder of which it had found Espinosa guilty was "especially wicked, evil, atrocious or cruel." Id. Noting that similar language had already been condemned by the court as "unconstitutionally vague," id. at 1081 (citations omitted), the Court rejected Florida's arguments that its two-step process — granting the trial judge the ultimate choice between death and life imprisonment and requiring that the court issue a written statement of the circumstances found and weighed — was unavailing since the jury presumably considered the unconstitutionally vague aggravator, and the trial judge was required to give great weight to the jury's recommendation. Id. at 1082. The Court concluded

that "if a weighing State decides to place capital sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances." Id.

The clear distinction between Espinosa and Eichinger's situation is that the jury was not instructed that "maliciousness, wickedness and evilness" was an aggravating factor. Petitioner concedes that the prosecutor's comment was at best a comment on a non-statutory factor. Accordingly, we find that the appropriate Supreme Court precedents to which we apply the "contrary to/unreasonable application of" test should be the Darden/Donnelly/Young line of cases that ask whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643). Thus, we examine the statement in context to determine its probable effect on the jury's ability to judge the evidence fairly. Young, 470 U.S. at 11-14.

The PSC's consideration of the comment was not contrary to this line of cases. Its rationale that the prosecutor's comments were "merely a review of evidence properly admitted into the record and were within permissible characterization of the facts proven by that evidence" examined the comment in context of the evidence as a whole and found it had no effect on the jury because a finding that the jury would use that comment to find an impermissible non-statutory aggravating factors was "wholly irrational." Neither was it an unreasonable application of that line. Clearly, the prosecutor's comment urging the jury to consider the nature of Eichinger's actions was not intended to prove, as an additional aggravating factor, that the offense was malicious, wicked and evil; it was proper argument based on legitimate inferences from the evidence. Because the comments were not objectionable, the state courts' determination that counsel was not ineffective for failing to object thereto is also not an unreasonable application of Strickland.

### E.    Improper "No Mercy" Argument

Finally, Eichinger argues that the prosecutor improperly argued to the jury "that it would be wrong for the jury to show mercy to Petitioner, even if based on the evidence."  (Pet. Mem. at 180.)  The specific comment was "He is already trying to create and manufacture some sympathy from you.  The psychiatric evidence.  That should really, really offend you."  (Id. (quoting N.T. 11/2/05 at 10-11).)   Eichinger argues, without citation to any United States Supreme Court decisions, that this comment exceeded the bounds of propriety.  (Id. (citing Lesko, 925 F.2d at 1545 and Peterkin v. Horn, 176 F. Supp. 2d 342, 372 (E.D. Pa. 2001)).)

The PSC rejected this argument on the merits stating:

> Appellant argues the comment was improper because a sentencing jury must be free to consider mitigating evidence and show mercy to the defendant.  He cites no authority in support of the argument, and in fact, it has no merit.  A prosecutor is allowed to argue that a sentencing jury in a capital case should show no mercy.

(A185 (citation omitted).)

We find that this holding is not contrary to the Darden/Donnelly/Young line of cases.  Given the ordinary meaning of the words used and placed in context of the entirety of the prosecutor's argument and the trial evidence presented by the defense to try to convince the jury on the statutory mitigating factor that Eichinger was acting under the influence of extreme mental or emotional disturbance, the comment that the psychiatric evidence was intended to manufacture sympathy and "should really, really offend you" was fair comment on disputed evidence and did not infect the trial with unfairness.  Nothing in the statement may fairly be read to imply that the jury was prohibited from showing mercy to Petitioner.  At best, the prosecutor argued only that mercy was not warranted.  Compare Peterkin, 176 F. Supp. 2d at 372-73 (finding improper the comment that "[m]ercy has no part in your deliberation").

Because the comment was not objectionable, the state court's conclusion that counsel may not be deemed ineffective for failing to raise a meritless objection was not an unreasonable application of <u>Strickland</u>.

## XI.    TRIAL COURT ERROR IN PENALTY PHASE INSTRUCTIONS; INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO OBJECT

Eichinger argues that the trial court violated his Eighth Amendment and Fourteenth Amendment rights during jury instructions in three ways:  (1) by misleading the jury into believing that the elements of first-degree murder count as aggravating factors; (2) by failing to properly inform the jurors about the likelihood of a commuted sentence; and (3) by emphasizing a preference for the death penalty over life imprisonment.  (Pet. Mem. at 184.)

### A.    Defining Malice and Premeditation

Petitioner first asserts counsel should have objected to the trial court's inclusion of definitions of malice, specific intent, and premeditation in its preliminary jury instructions since, having been found guilty after stipulating to the Commonwealth's evidence, the jury was not required to find the elements of first degree murder, and the jury was limited to deliberating only aggravating and mitigating factors.  Again citing the United States Supreme Court decision in <u>Espinosa</u>, he argues that including the definitions permitted the jury to consider invalid aggravators.  (Pet. Mem. at 187 (citing <u>Espinosa</u>, 505 U.S. at 1081 ("in a State where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment.").)

The trial court's preliminary jury instructions told the jury that Eichinger had been already been convicted of the first-degree murders and then described the elements of that crime:

Now, in the prior proceeding, the defendant was found guilty beyond a reasonable

doubt of four counts of first degree murder. In a moment I will further define for you what that means. In the prior proceeding, the defendant was also found guilty beyond a reasonable doubt of two charges of possession of an instrument of crime and three charges of unsworn falsification to authorities.

* * *

First degree murder in Pennsylvania is described as follows: First degree murder is murder in which the killer has the specific intent to kill.

The following three elements have been proven previously beyond a reasonable doubt: First, that the particular victim is dead. Second, that the defendant killed her. And third, that the defendant did so with the specific intent to kill and with malice.

Now, a person who kills must act with malice to be guilty of any degree of murder, and malice is what separates murder from manslaughter.

The word malice as I am using it has a special legal meaning. It does not mean simply hatred, spite or ill will. Malice is a shorthand way of referring to any of three different mental states that the law regards as being bad enough to make a killing murder. Thus, a killing is with malice if the killer acts with, first, an intent to kill; second, an intent to inflict serious bodily harm; or third, a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, indicating an unjustified disregard for the probability of death or great bodily harm, and an extreme indifference to the value of human life.

Now, a person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. As my earlier definition of malice indicates, a killing by a person who has the specific intent to kill is a killing with malice. Stated differently, a killing is with a specific intent to kill if it is willful, deliberate and premeditated, such as, but not limited to, by means of poison or by lying in wait.

The specific intent to kill, including the premeditation needed for first degree murder, does not require planning or previous thought or any particular length of time. It can occur quickly. All that is necessary is that there be time enough so that the defendant can and does fully form an intent to kill and is conscious of that intention.

When deciding whether defendant had the specific intent to kill, the jury would consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind. If the jury believed that the defendant intentionally used a deadly weapon on a vital part of the victim's body, the jury may regard that as an item of circumstantial evidence from which they may, if they choose, infer the defendant had the specific intent to kill.

(N.T. 11/1/05 at 24-27.)

Eichinger points out that the prosecutor referred to these instructions during his opening

and closing statements. He argues the following comment was improper:

> There are two things that I want you to keep in mind when every witness testifies
> and when every piece of evidence is presented, two things, two prisms I want you
> to view this case through and all of the evidence that comes from the stand. Number
> one, that defendant is a malicious killer. Malice. You heard what the judge said.
> Wickedness of disposition. Hardness of heart. Cruelty. An extreme indifference
> to the value of human life. Wickedness. Another word for wickedness is evilness.
>
> So bear in mind, number one, the defendant is a malicious killer.

(A194 (quoting N.T. 11/1/05 at 40).) Because this instruction allowed the jury to consider the

invalid aggravators of malice, specific intent, and premeditation, Eichinger argues that trial

counsels' failure to object to the instruction and the prosecutor's comments constitute ineffective

assistance of counsel.

The PSC rejected this argument on the merits stating:

> Appellant's reading of the trial court's and prosecutor's comments is unreasonable.
> Neither the trial court nor the prosecutor ever stated malice, specific intent, or
> premeditation were aggravators for the purpose of capital murder sentencing, nor
> could that rationally be inferred from the trial court's opening instructions or the
> prosecutor's arguments. The trial court's instructions are clearly background
> information meant to orient the jury as it carried out its task. The prosecutor's
> comments are argumentation well within the bounds of permissible oratory, as
> discussed above. Even if appellant's characterization of the cited language was
> reasonable, any confusion the jury may have had was corrected by the trial court's
> clear and complete instruction quoted above.

(A194.)

In reviewing the adequacy of jury instructions, the instructions must be viewed as a whole

and in context. See Victor v. Nebraska, 511 U.S. 1, 6 (1994) ("'taken as a whole, the instructions

[must] correctly conve[y] the concept of reasonable doubt to the jury.'" (quoting Holland v. United

States, 348 U.S. 121, 140 (1954) (alterations in original))). Specifically, when reviewing a state

court's jury instructions, federal habeas courts must look at the instructions as an entirety.  Estelle

v. McGuire, 502 U.S. 62, 72 (1991).  We must determine:

> "whether the ailing instruction by itself so infected the entire trial that the resulting
> conviction violates due process."  Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct.
> 396, 400-01, 38 L.Ed.2d 368 (1973); see also Henderson v. Kibbe, 431 U.S. 145,
> 154, 97 S.Ct. 1730, 1736-37, 52 L.Ed.2d 203 (1977); Donnelly v. DeChristoforo,
> 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) ("'[I]t must be
> established not merely that the instruction is undesirable, erroneous, or even
> "universally condemned", but that it violated some constitutional right.'"  It is well
> established that the instruction "may not be judged in artificial isolation," but must
> be considered in the context of the instructions as a whole and the trial record.  Cupp
> v. Naughten, *supra*, at 147, 94 S.Ct., at 400-01.

Estelle, 502 U.S. at 72.

Examining the trial court's instructions in their entirely, we find that the inclusion of

definitions of the elements of first degree murder did not so infect the entire trial that the resulting

death sentences violated due process.  First, Eichinger's reliance on Espinosa is inapt as there is

no suggestion in the trial court's preliminary instructions or in the prosecutor's comments that the

elements of first degree murder were death sentence aggravators under Pennsylvania law or that

the definitions permitted the jury to consider invalid aggravators.  Second, the quoted instruction

makes clear the jury was told that these elements had already been proven in a prior proceeding

where the jury was not present.  Thus, placed in their proper context, definitions were offered to

provide the jury an understanding of what had occurred previously, and no rational jury could have

considered them otherwise.  Third, to the extent that the preliminary instructions may have caused

confusion, the trial court's final jury instructions, which listed the aggravating circumstances the

jury was permitted to consider, did not include malice, specific intent, or premeditation in the list.

Accordingly, we find the trial court's instructions and the prosecutor's comment did not

permit the jury to consider invalid aggravators, and the state court's conclusion that counsels'

failure to raise an objection thereto was not ineffective assistance is not an unreasonable application of Strickland.

**B.     The Likelihood of a Commuted Sentence**

Eichinger next asserts error in the trial court's penalty phase instructions occurred when the jury was told that he could someday be released from prison if the death penalty was not imposed:

> I'll explain something about a sentence of life imprisonment.  Under Pennsylvania law, a prisoner who has been convicted of first degree murder and who is serving a sentence of life imprisonment is not eligible for parole.  The parole board has no power to release the prisoner from prison.  The only way such a prisoner can obtain release is by a commutation granted by the governor.  Pennsylvania has a Board of Pardons as well as a parole board.  If a life prisoner can convince the Board of Pardons that his sentence should be commuted, that is made shorter, and the Board of Pardons **unanimously** recommends this to the governor, the governor has the power to shorten the sentence.  If the governor follows the Pardon Board's recommendation and commutes the sentence, the prisoner may be released early or become eligible for parole in the future.

> I will tell you that the governor and the Board of Pardons **rarely** commutes a sentence of life imprisonment.

(N.T. 11/3/05 at 62 (emphasis added).)  Eichinger takes issue with the statement that commutations are rare.  He argues that, at the time of his trial, commutations were non-existent, and the assertion they were merely rare was false and falsely implied to the jury that there was a chance he would eventually be released and pose a threat to public safety if the death penalty was not imposed.  (Pet. Mem. at 188.)  Additionally, he argues that the trial court failed to inform the jury that the unanimity requirement, imposed 10 years before Eichinger's trial, further reduced the likelihood that a commutation would reach the Governor's desk for final approval.  (Id. at 189.) Combined with the prosecutor's comment about future dangerousness, he argues that the instruction was "especially ominous" (Pet. Mem. at 190) and ran afoul of the United States Supreme Court's decision in California v. Ramos, 463 U.S. 992 (1983), reversing a death sentence

"[b]ecause of the potential that the sentencer might have rested its decision in part on erroneous or inaccurate information that the defendant had no opportunity to explain or deny, [and] the need for reliability in capital sentencing. . . ." Id. at 1004.

The PSC rejected this argument on the merits stating:

> [T]he trial court's statement about the frequency of commuted life sentences was factually correct in that since 1997, two people with life sentences have had those sentences commuted to a term of years. Furthermore, it cannot reasonably be read to suggest danger to the public should the jury forgo a death sentence; quite the opposite, it is only reasonably read as reassurance to the jury appellant would not pose a threat to safety regardless of its choice. . . . Furthermore, counsel is not deemed ineffective for failing to object to a jury instruction given by the court where the instruction itself is justifiable or not otherwise improper.

(A195.)

We find that the state courts' presumptively correct factual finding that commutations were rare has not been rebutted by clear and convincing evidence. Eichinger contends that in the period following the 1997 amendment to the Pennsylvania Constitution implementing the unanimous recommendation requirement, only one life sentence has been commuted. (Pet. Mem. at 189 (citing A2115 (Pennsylvania Report of the Advisory Committee on Geriatric and Seriously Ill Inmates at 4 (June 22, 2005)))). The PSC, in its 2013 decision affirming the denial of Petitioner's PCRA petition, stated that two life sentences had been commuted. (A195.) In either case, describing the number as "rare" would not be inaccurate. What would be inaccurate is Eichinger's factual assertion that such commutations were "non-existent." Because the statement was "accurate information," we find that the PSC's rejection of Petitioner's argument was not contrary to or an unreasonable application of Ramos, and the finding that counsels' failure to raise an objection thereto was not ineffective assistance was not an unreasonable application of Strickland.

## C. Emphasizing a Preference for the Death Penalty

Finally, Eichinger contends that counsel was ineffective for failing to object to the trial court's instructions that were allegedly problematic due to "the combined absence of a presumption of life instruction and the court's repeated emphasis on death throughout. . . ." (Pet. Mem. at 190.) While trial counsel asked for a presumption of life imprisonment instruction (see A314-15[31]), Eichinger argues that the requested language was not accepted, and "the trial court offered a series of instructions that described the parties' burdens of proof and the mechanism by which Pennsylvania jurors are to find and weigh aggravating and mitigating circumstances," which "systematically emphasized the primacy of death over life." (Pet. Mem. at 191.)

The trial court's opening instructions to the jury told them:

> You are about to perform one of the most serious duties of citizenship. You will decide whether a fellow person, the defendant John Eichinger, shall be sentenced to death or life imprisonment without parole for three charges of first degree murder for which he has previously been found guilty beyond a reasonable doubt.

> \*       \*       \*

> Now, in this sentencing trial, evidence will be presented on the question of the sentence to be imposed, either death or life imprisonment. Counsel may present additional evidence and make further arguments, and then you will decide whether

---

[31] The requested instruction reads:

> There is a presumption of life imprisonment in this case. Unless the prosecution proves beyond a reasonable doubt that the sentence should be death instead of life in prison, you must return a verdict of life in prison. This presumption of life imprisonment remains with Mr. Eichinger throughout these proceedings, unless the prosecution proves to your satisfaction beyond a reasonable doubt that Mr. Eichinger should be put to death instead of being sentenced to life in prison. Any decision by you that the prosecution has prove[n] an alleged statutory aggravating factor beyond a reasonable doubt, must be unanimous and each must be considered separately. The presumption in favor of life imprisonment shall be given effect by you until and unless it is overcome by the prosecution beyond a reasonable doubt.

(A314-15 (Memorandum of Law in Support of a Presumption of Life Instruction).)

to sentence the defendant to death or life imprisonment without parole.

Your sentence will depend on what you find about aggravating and mitigating circumstances. The sentencing code defines aggravating and mitigating circumstances, and I will explain these concepts to you in more detail later.

Your verdict must be a sentence of death if you unanimously find, that is all of you find, at least one aggravating and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances. If you do not all agree on one or the other of these findings, then the only verdict you may return is a sentence of life imprisonment.

\* \* \*

You, the jurors, are the sole judges of facts. It will be your responsibility at the end of the trial when you deliberate to evaluate the evidence and from the evidence find what the facts are, and then apply the rules of law which I will give you to the facts as you find them to decide whether to sentence the defendant to death or life imprisonment without parole.

(Docket Entry 104-163 (N.T. 11/1/05) at 16-17, 20.) After the close of evidence and trial counsels'

renewed and denied request for the presumption of life imprisonment instruction, the trial court's

final jury instructions stated:

Now, members of the jury, for the next few minutes, I'll be talking to you about the death penalty.

\* \* \*

First . . . you must understand that your verdict must be a sentence of death, if and only if, you unanimously find, that is all of you find, at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances. If you do not all agree on one or the other of these findings, then the only verdict that you may return is a sentence of life imprisonment without parole.

The Commonwealth must prove any aggravating circumstance beyond a reasonable doubt. This does not mean that the Commonwealth must prove the aggravating circumstance beyond all doubt or to a mathematical certainty.

A reasonable doubt is the kind of doubt that would cause a reasonable and sensible person to hesitate before acting upon a matter of importance in his or her own

affairs. A reasonable doubt must be a real doubt and may not be one that a juror imagines or makes up to avoid carrying out an unpleasant duty.

By contrast, the defendant must prove any mitigating circumstance; however, the defendant only has to prove it by a preponderance of the evidence, that is, by the greater weight of the evidence, which is a less demanding standard of proof than beyond a reasonable doubt. Facts are proven by a preponderance of the evidence when the evidence shows that it is more likely than not that the facts are true.

(N.T. 11/3/05 at 45-47.)

The court then proceeded to discuss, in detail, the criteria for each aggravating and mitigating circumstance that could possibly have applied to each of the three capital murder victims, reiterating the beyond a reasonable doubt standard for each possible aggravator and the preponderance of the evidence standard for each possible mitigator.[32] (Id., at 47-54.) The court then gave a lengthy instruction on how the jury was to complete the verdict slip:

As I told you earlier, you must unanimously agree on one of two general findings before you can sentence the defendant to death. They are a finding that there is at least one aggravating circumstance and no mitigating circumstance, or a finding that there are one or more aggravating circumstances that outweigh any mitigating circumstance or circumstances.

In deciding whether aggravating outweigh mitigating circumstances, do not simply count the number. Compare the seriousness and importance of the aggravating with the mitigating circumstances. If you all agree on either one of the two general findings, then you can and must sentence the defendant to death.

When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance [as] present, despite what other jurors may believe. This is different from the general findings to reach your ultimate sentence of either life in prison or death.

The specific findings as to any particular aggravating circumstance must be unanimous. All of you must agree that the Commonwealth has proven it beyond a reasonable doubt. That is not true for any mitigating circumstance. Any circumstance that any juror considers to be mitigating may be considered by that

---

[32] While Eichinger refers to these instructions as "all of the ways in which it could return a death outcome," (Pet. Mem. at 193), the trial court never used those words.

juror in determining the proper sentence.

This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives the defendant the full benefit of any mitigating circumstance or circumstances. It is closely related to the burden of proof requirement.

So remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt, while the defendant only has to prove any mitigating circumstance by a preponderance of the evidence.

**Your final sentence, life imprisonment without parole, or death, must be unanimous**. All of you must agree that the sentence should be life imprisonment or that the sentence should be death, because there is at least one aggravating circumstance and no mitigating circumstance, or because the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances found by any juror.

Now, if you do not agree unanimously on the death sentence and on one of the two general findings that will support it, then you have two immediate options. You may either continue to discuss the case and deliberate the possibility of a death sentence; or, **if you all agree to do so, you may stop deliberating and sentence [appellant] to life imprisonment**.

If you come to a point where you have deliberated conscientiously and thoroughly and still cannot all agree either to sentence [appellant] to death or to stop and sentence him to life imprisonment, you would report that to me. If it seems to me that you are hopelessly deadlocked, it will be my duty to sentence [appellant] to life imprisonment.

(Id. at 56-59 (emphasis added).) Eichinger asserts it was improper for the trial court to have never told the jury that it could "affirmatively reach a verdict that a life sentence was the appropriate punishment. . . ." (Pet. Mem. at 193 ("At no point did the court instruct the jury on the possibility that it may have agreed unanimously on a sentence of life without possibility of parole or that it could continue to discuss the case and deliberate the possibility of a sentence of life without possibility of parole.").) He also complains that, "[w]ith regard to a death sentence, the trial court did not ever tell the jury it had to explain the reasons for 'rejecting' a sentence of life imprisonment." (Id. at 195.)

He argues that the instructions above violated his rights in two fundamental ways. First, under the Sixth Amendment's presumption of innocence, he was entitled to a presumption of life imprisonment since "[t]he penalty phase of a Pennsylvania capital trial is a trial on capital murder, i.e., murder simpliciter plus aggravating circumstances that outweigh mitigating circumstances. In other words, capital murder is the functional equivalent of a separate offense." (Id. (citing Ring v. Arizona, 536 U.S. 584, 588 (2002)). Second, the trial court's instructions improperly established a presumption in favor of death, an outcome that has been rejected by the Supreme Court. (Id. at 196 (citing Kansas v. Marsh, 548 U.S. 163, 178 (2006) (upholding Kansas's death penalty scheme, which allows imposition of death if aggravators and mitigators are in "equipoise," only after determining that the scheme "does not create a general presumption in favor of the death penalty," but rather "is dominated by the presumption that life imprisonment is the appropriate sentence for a capital conviction"))).

On PCRA appeal, the PSC rejected Eichinger's ineffective assistance of counsel argument on the merits finding that his "contention the instructions created a 'primacy for death over life' is plainly unreasonable. . . . . The instructions effectively explained how the jury was to come to a sentence of life imprisonment or death under the death penalty statute." (A192.) Earlier, on direct appeal, the PSC had rejected substantive state law objections to the same instructions holding:

> Eichinger cites to Commonwealth v. Travaglia, 467 A.2d 288 (Pa. 1983), in which this Court stated, "It may be acknowledged that in some sense there is a 'presumption of life' — this from the fact that the prosecution is limited to specific aggravating circumstances which must be proven beyond a reasonable doubt, while the defendant is permitted great latitude in demonstrating mitigating circumstances, and then by the lesser preponderance standard." Id. at 300-01. Eichinger frames his argument as a denial of due process by the trial court.
>
> The Commonwealth maintains that the instructions that were given comported with the standard jury instructions and that there is no standard instruction for a presumption of life.

The trial court found Eichinger's proposed instruction to be redundant as the standard instructions provide that if the jury cannot agree that either there is one or more aggravating factors and no mitigating factor or that aggravating factors outweigh mitigating factors then "the only verdict you may return is a sentence of life imprisonment." Trial Court Opinion 03/03/06, p. 14. Moreover, the instructions specifically provide that if the jury could not unanimously agree, then a life sentence would result. Id. From this language, the trial court concluded that Eichinger's proposed instruction was not necessary.

Our standard of review for penalty phase jury instructions is the same as that which guides us in reviewing a jury charge during the guilt phase of a trial. In reviewing a challenge to a jury instruction the entire charge is considered, not merely discrete portions thereof. Commonwealth v. Stokes, 615 A.2d 704, 708 (Pa. 1992). The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury. Id.

It is the policy of this Court to give our trial courts latitude and discretion in phrasing instructions. Further, Travaglia's discussion of a presumption of life is good law. The Commonwealth does bear a heavier burden to show aggravating factors beyond a reasonable doubt while we have consistently held that factors in mitigation need only be proven by a mere preponderance of the evidence. In this we recognize that life has intrinsic value and should not be taken by the state without good cause, proven to our highest standard, whereas life imprisonment remains our default punishment for capital cases.

Although acceptable, the words "presumption of life" are not explicitly required to honor this concept. An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed.

…

When we view the penalty phase jury instructions in their entirety, we find that the trial court's charge to the jury clearly and accurately explained the respective burdens of proof and the presumption of life to which Eichinger was entitled.

(A17-20.)

We find that the PSC's conclusion that Eichinger's penalty phase instructions challenge lacked merit is not an unreasonable application of clearly established Supreme Court law. The due process clause of the Fourteenth Amendment requires the Commonwealth to prove beyond a

reasonable doubt every element of the crime with which a defendant is charged.  In re Winship, 397 U.S. 358 (1970); United States v. Gaudin, 515 U.S. 506, 510, 522-23 (1995).  A defendant's conviction violates due process when the trial court fails to instruct the jury on an element that the prosecution must prove beyond a reasonable doubt.  Gaudin, 515 U.S. at 522-23.

In determining whether a jury instruction runs afoul of due process, a court "must focus initially on the specific language challenged."  Francis v. Franklin, 471 U.S. 307, 315 (1985); Smith v. Horn, 120 F.3d 400, 411 (3d Cir. 1997).  The court must then consider the challenged language in the context of the jury charge as a whole.  Francis, 471 U.S. at 309, 318-19; Smith, 120 F.3d at 411.  The ultimate question is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); Smith, 120 F.3d at 411.  Under Boyde, it is not enough that a disputed instruction might have been, or could have been, misinterpreted by the jury or that a single juror, or some number less than all of the jurors, was confused by the instruction.  Id. at 378-80.  The Boyde standard requires a petitioner to demonstrate a reasonable probability that all the jurors were sufficiently confused by the disputed instruction as to have interpreted the charge in an unconstitutional manner.  Id.; see also Weeks v. Angelone, 528 U.S. 225, 236 (2000) (rejecting the notion that a possibility, rather than a reasonable probability, of total jury confusion is sufficient for constitutional error).  Finally, if a jury instruction is found to violate due process, that error must not be harmless.  Neder v. United States, 527 U.S. 1, 9 (1999) (holding that harmless error analysis applies to jury instructions that violate the principle of Gaudin); Smith, 120 F.3d at 417-18 (applying the harmless error standard to habeas petitioner's claim that trial court improperly instructed the jury that it could convict without finding that petitioner had specific intent to kill).

As dictated by the United States Supreme Court's decision in <u>Francis</u>, the PSC on both direct appeal and PCRA appeal focused on the specific language challenged, finding that the penalty phase instructions as a whole clearly and accurately explained the respective burdens of proof and the presumption of life to which Eichinger was entitled. There is no assertion that the jury was permitted to find an aggravating factor without proof of that factor beyond a reasonable doubt. Accordingly, the state court decisions were not contrary to <u>Winship</u>. Neither did the instructions direct the jury to find that any aggravating factor had already been established or how it must decide the ultimate issue of whether the death penalty should be imposed.

We further find that the PSC's determination on direct appeal that, although acceptable, the words "presumption of life" are not explicitly required, is not contrary to the decisions cited by Eichinger. In <u>Kansas v. Marsh</u>, the Court upheld the Kansas death penalty statute that required, like Pennsylvania's, a separate sentencing hearing in which the state must prove beyond a reasonable doubt the existence of one or more statutorily enumerated aggravating circumstances. It rejected the argument that the statute created "a general presumption in favor of the death penalty in the State of Kansas. Rather, the Kansas capital sentencing system is dominated by the presumption that life imprisonment is the appropriate sentence for a capital conviction." <u>Id.</u>, 548 U.S. at 178. Supporting this conclusion were the statutory provisions — substantively indistinguishable from Pennsylvania's — requiring that (1) if the state failed to meet its burden to demonstrate the existence of an aggravating circumstance(s) beyond a reasonable doubt, a sentence of life imprisonment must be imposed; (2) if the state overcame that hurdle, it bore the additional burden of proving beyond a reasonable doubt that aggravating circumstances are not outweighed by mitigating circumstances; (3) although the defendant bore the burden of production to proffer mitigating circumstances, he never bore a burden of demonstrating that mitigating circumstances

outweigh aggravating circumstances; the state always had that burden; (4) absent the state meeting that burden, the default was life imprisonment; and (5) if the jury was unable to reach a unanimous decision, a sentence of life was required to be imposed.  Id. at 178-79.  While Eichinger focuses upon the Court's wording that the Kansas scheme "does not create a general presumption in favor of the death penalty," his bald argument that Pennsylvania's scheme does do so finds no support in the Marsh decision.[33]

His argument that the trial court's instructions' repeated emphasis on death, coupled with the refusal to provide a presumption of life imprisonment instruction created the risk that the death penalty would be "imposed in spite of factors which may call for a less severe penalty," is also meritless.  How else could the trial court effectively explain the jury's role and the parties' respective burdens in the penalty phase without mentioning death?  More importantly, Eichinger identifies no United States Supreme Court decision that affirmatively requires the presumption of life imprisonment instruction.  Considering the instructions as a whole and in context, we find that

---

[33]  Eichinger's quotation from Stringer v. Black, 503 U.S. 222, 235-36 (1992) ("Because the use of a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty, we cautioned in Zant [v. Stephens, 462 U.S. 862 (1983)] that there might be a requirement that when the weighing process has been infected with a vague factor the death sentence must be invalidated.") is inexplicable since Eichinger does not identify any vague aggravating factor.  His citation to Cupp v. Naughten, 414 U.S. 141 (1973) actually supports the opposite conclusion Petitioner seeks to reach.  In Cupp, the respondent had successfully challenged a jury instruction on the ground that it had the effect of shifting onto him the burden of establishing his innocence.  In reversing this holding, the Supreme Court stressed that the trial court "gave, not once but twice, explicit instructions affirming the presumption of innocence and declaring the obligation of the State to prove guilt beyond a reasonable doubt."  Id. at 147.  Here, (1) there was no presumption of innocence since Eichinger stipulated to the Commonwealth's evidence and was convicted in the guilt phase trial, and the issue of his innocence was not before the jury, and (2) the instructions challenged here, like those in Cupp, also stated the Commonwealth had the burden to prove aggravating factors beyond a reasonable doubt.  Nothing in this decision can be read to support the proposition that a defendant facing the death penalty is entitled to a presumption of life sentence instruction like that proposed by Eichinger.

the PSC's decisions are not contrary to or an unreasonable application of Supreme Court law. Because the instructions were not objectionable, the state court's conclusion that trial counsel cannot have been ineffective for failing to raise a meritless objection is not an unreasonable application of Strickland.

## XII.    CUMULATIVE ERROR

Finally, Eichinger argues that the errors of trial and appellate counsel, the prosecutor, and the trial court individually and collectively denied him due process, reliable sentencing, and effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.  He argues that if we find that he is not entitled to relief based on any single claim for failing to show prejudice, that he is still entitled to relief on a separate habeas claim based on the cumulative prejudicial effect of all of the errors.

In deciding this issue, the PSC stated:

No number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually, except occasionally where the individual claims are all rejected solely for lack of prejudice.  []  In this case each of appellant's individual ineffectiveness claims have been rejected for failing one or more of the first two prongs of the [Pennsylvania equivalent of the Strickland] test; none has been rejected solely for lack of prejudice.  Therefore, there is no basis for an accumulation claim.

(A201-02.)  We find that this holding is not contrary to federal law as determined by the United States Supreme Court.

Notably, Eichinger does not cite to any United States Supreme Court cases that approve of cumulative error as a separate habeas claim.  Rather he cites to several Third Circuit decisions that have suggested that such a claim may be viable.  Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002) (stating that "errors that individually do not warrant a new trial may do so when combined," but holding that "even were we to cumulate all the claimed errors and superimpose them over the

extensive trial proceedings, given the quantity and quality of the totality of the evidence presented to the jury, we could not conclude that the New Jersey Supreme Court unreasonably applied Supreme Court precedent or unreasonably determined the facts in making its ruling."); Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. . . . Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice. . . . However, even if we were to combine all of the prosecutor's allegedly improper remarks with the admission of Fahy's detailed confession, there is still weighty evidence of Fahy's guilt in the record.") (citing Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007)). Because there is no clearly established Supreme Court law on this issue, Eichinger cannot satisfy the AEDPA contrary to/unreasonable application standard with regard to the state court's cumulative error decision.

Even if cumulative error is a proper AEDPA ground, we also find that, because each individual claim of error is insubstantial, Eichinger cannot show the state court's treatment of his cumulative error claim was error. Given the quantity and quality of the evidence, he cannot show prejudice resulting from an accumulation of his individual claims of error or that their combined force undermined the fundamental fairness of the process leading to his convictions and the imposition of the death penalty.

## XV.    CERTIFICATE OF APPEALABILITY

To appeal a final order in a habeas corpus proceeding, a prisoner in state custody must first be issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A). To receive a

certificate, the petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253((c)(2); see also Slack v. McDaniel, 529 U.S. 473, 484-85 (2000). "That standard is met when 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner.'" Welch v. United States, 136 S. Ct. 1257, 1263 (quoting Slack, 529 U.S. at 484).

Having found that no claim raised by Eichinger has any merit, we also find that he has failed to make a substantial showing of the denial of a constitutional right and that no reasonable jurist would reach different conclusions. Accordingly, we decline to issue a certificate of appealability.

## XVI. CONCLUSION

We find that the federal habeas claims raised by John Charles Eichinger attacking his convictions for the first-degree murders of Jennifer Still, Heather Greaves, Lisa Greaves and Avery Johnson, and his claims attacking the imposition of death sentences for the first-degree murders of Heather Greaves, Lisa Greaves and Avery Johnson are meritless. Accordingly, the Petition for Writ of Habeas Corpus is denied. Because Eichinger has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied under 28 U.S.C. § 2253(c)(1)(A) with regard to all issues. An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova

_____
John R. Padova, J.